# WILLIAMS *v.* UNITED STATES

No. 80–2116.   Argued April 20, 1982—Decided June 29, 1982

BLACKMUN, J., delivered the opinion of the Court, in which POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 291. MARSHALL, J., filed a dissenting opinion, in which BURGER, C. J., and BRENNAN and WHITE, JJ., joined, *post*, p. 292.

*Nickolas P. Chilivis* argued the cause and filed briefs for petitioner.

*Richard G. Wilkins* argued the cause *pro hac vice* for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Shapiro, William C. Bryson, Douglas S. Wood,* and *Janis H. Kockritz.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we must decide whether the deposit of a "bad check" in a federally insured bank is proscribed by 18 U. S. C. § 1014.

I

In 1975, petitioner William Archie Williams purchased a controlling interest in the Pelican State Bank in Pelican, La., and appointed himself president. The bank's deposits were insured by the Federal Deposit Insurance Corporation.

Among the services the bank provided its customers at the time of petitioner's purchase was access to a "dummy account," used to cover checks drawn by depositors who had insufficient funds in their individual accounts. Any such check was processed through the dummy account and paid from the bank's general assets. The check was then held until the customer covered it by a deposit to his own account, at which time the held check was posted to the customer's account and the dummy account was credited accordingly. As president of the bank, petitioner enjoyed virtually unlimited use of the dummy account, and by May 2, 1978, his personal overdrafts amounted to $58,055.44, approximately half the total then covered by the account.

On May 8, 1978, federal and state examiners arrived at the Pelican Bank to conduct an audit. That same day, peti-

tioner embarked on a series of transactions that seemingly amounted to a case of "check kiting."[1]  He began by opening a checking account with a deposit of $4,649.97 at the federally insured Winn State Bank and Trust Company in Winnfield, La.  The next day, petitioner drew a check on his new Winn account for $58,500—a sum far in excess of the amount actually on deposit at the Winn Bank—and deposited it in his Pelican account.  Pelican credited his account with the face value of the check, at the same time deducting from petitioner's account the $58,055.44 total of his checks that previously had been cleared through the dummy account.  At the close of business on May 9, then, petitioner had a balance of $452.89 at the Pelican Bank.

On May 10, petitioner wrote a $60,000 check on his Pelican account—again, a sum far in excess of the account balance—and deposited it in his Winn account.  The Winn Bank immediately credited the $60,000 to petitioner's account there, and Pelican cleared the check through its dummy account when it was presented for payment on May 11.  The Winn Bank rou-

---

[1] As the Government explains, a check-kiting scheme typically works as follows: "The check kiter opens an account at Bank A with a nominal deposit.  He then writes a check on that account for a large sum, such as $50,000.  The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account.  At the time of deposit, the check is not supported by sufficient funds in the account at Bank A.  However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B.  During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A.  At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.

"By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time.  In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks . . . ."  Brief for United States 12–13.

tinely paid petitioner's May 9 check for $58,500 when it cleared on May 12.

Petitioner next attempted to balance his Pelican account by depositing a $65,000 check drawn on his account at yet another institution, the Sabine State Bank in Many, La. Unfortunately, the balance in petitioner's Sabine account at the time was only $1,204.81. The Sabine Bank therefore refused payment when Pelican presented the check on May 17. On May 23, petitioner settled his Pelican account by depositing at the Pelican Bank a $65,000 money order obtained with the proceeds from a real estate mortgage loan.

The bank examiners, meanwhile, had been following petitioner's activities with considerable interest. Their scrutiny ultimately led to petitioner's indictment, in the United States District Court for the Western District of Louisiana, on two counts of violating 18 U. S. C. § 1014.[2] That provision makes it a crime to

> "knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action of [certain enumerated financial institutions, among them banks whose deposits are insured by the Federal Deposit Insurance Corporation], upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan . . . ."

The first of the counts under § 1014 was directed at the May 9, 1978, check drawn on the Winn Bank, and charged that petitioner "did knowingly and willfully overvalue . . . a security, that is a check . . . for the purpose of influencing the Pelican State Bank, . . . a bank the deposits of which are insured by the Federal Deposit Insurance Corporation, upon an advance of money and extension of credit." The other

---

[2] Petitioner also was charged with—and thereafter convicted of—one count of misapplying bank funds, in violation of 18 U. S. C. § 656. The validity of that conviction, which was affirmed on appeal, is not before us.

§ 1014 count used virtually identical language to indict petitioner for depositing in his Winn account the May 10 check drawn on the Pelican Bank. App. 3–4.[3]

At petitioner's trial the court charged the jury that "[a] check is a security for purposes of Section 1014." The court then explained that "[t]he Government charges that Mr. Williams was involved in check-kiting—a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two or more banks." *Id.*, at 36. To convict petitioner, the court continued, the jury had to find as to each count that "the defendant . . . did knowingly and willfully make a false statement of a material fact," that the statement "influence[d] the decision of the [bank] officers or employees," and that "the defendant made the false statement with fraudulent intent to influence the [bank] to extend credit to the defendant." *Id.*, at 37–38. "The crucial question in check-kiting," the court concluded, "is whether the defendant intended to write checks which he could not reasonably expect to cover and thereby defraud the bank, or whether he was genuinely involved in the process of depositing funds and then making legitimate withdrawals against them." *Id.*, at 38. The jury convicted petitioner on both counts, and he was sentenced to six months' incarceration on the second § 1014 count. For the first § 1014 count he was placed on five years' probation, to begin upon his release from confinement. App. 39.[4]

---

[3] Neither of the § 1014 counts of the indictment expressly charged petitioner with making a "false statement." The first count, however, did allege that he "presented said check for deposit at Pelican State Bank . . . and represented and caused to be represented to said bank that said check was of a value equal to the face amount of the check, when in truth and fact, as the [petitioner] then well knew, there were no sufficient funds in the account of W. A. Williams at the Winn State Bank and Trust Company, to cover said check." App. 3. Similar language was employed in the second § 1014 count. *Id.*, at 4.

[4] The sentence of probation also applied to petitioner's conviction for misapplication of bank funds. See n. 2, *supra.*

Among other things, petitioner argued on appeal that the indictment did not state a violation of § 1014. The Court of Appeals rejected this contention, however, concluding that petitioner's actions "constitute classic incidents of check kiting." 639 F. 2d 1311, 1319 (CA5 1981). In line with its earlier decision in *United States* v. *Payne*, 602 F. 2d 1215 (CA5 1979), cert. denied, 445 U. S. 903 (1980), the court found such action proscribed by the statute.

We granted certiorari, limited to Questions 3 and 4 presented by the petition, in order to resolve a conflict concerning the reach of § 1014.[5] 454 U. S. 1030 and 1096 (1981).

## II

To obtain a conviction under § 1014, the Government must establish two propositions: it must demonstrate (1) that the defendant made a "false statement or report," or "willfully overvalue[d] any land, property or security," and (2) that he did so "for the purpose of influencing in any way the action of [a described financial institution] upon any application, advance, . . . commitment, or loan." We conclude that petitioner's convictions under § 1014 cannot stand, because the Government has failed to meet the first of these burdens.

## A

Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms,

---

[5] See *United States* v. *Sher*, 657 F. 2d 28 (CA3 1981), cert. pending, No. 81–1047 (holding that § 1014 does not proscribe check kiting). Cf. *United States* v. *Krown*, 675 F. 2d 46, 50 (CA2 1982) (noting the conflict).

make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, 2 U. L. A. 17 (1977), a check is simply "a draft drawn on a bank and payable on demand," § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2), 2 U. L. A. 424 (1977). The Code also makes clear, however, that "[a] check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it." § 3–409(1), 2 U. L. A. 408 (1977). Louisiana, the site of petitioner's unfortunate banking career, embraces verbatim each of these definitions. See La. Rev. Stat. Ann. §§ 10:3–104, 10:3–409, 10:3–413 (West Supp. 1982).[6]

For similar reasons, we conclude that petitioner's actions cannot be regarded as "overvalu[ing]" property or a security. Even assuming that petitioner's checks were property or a security as defined by § 1014, the value legally placed upon them was the value of petitioner's obligation; as defined by Louisiana law, that is the only meaning actually attributable to a bank check. See La. Rev. Stat. Ann. §§ 10:3–409(1), 10:3–413(2) (West Supp. 1982). In a literal sense, then, the face amounts of the checks were their "values."

The foregoing description of bank checks is concededly a technical one, and the Government therefore argues with some force that a drawer is generally understood to represent that he "currently has funds on deposit sufficient to cover the face value of the check." Brief for United States 19. See *United States* v. *Payne*, 602 F. 2d, at 1218. If the

---

[6] Unlike many state statutes that do proscribe conduct such as that engaged in by petitioner, the federal scheme obviously does not in terms reach the deposit of checks that are supported by insufficient funds. See Comment, Insufficient Funds Checks in the Criminal Area: Elements, Issues, and Proposals, 38 Mo. L. Rev. 432 (1973).

drawer has insufficient funds in his account at the moment the check is presented, the Government continues, he effectively has made a "false statement" to the recipient. While this broader reading of § 1014 is plausible, we are not persuaded that it is the preferable or intended one. It "slights the wording of the statute," *United States* v. *Enmons*, 410 U. S. 396, 399 (1973), for, as we have noted, a check is literally not a "statement" at all. In any event, whatever the general understanding of a check's function, "false statement" is not a term that, in common usage, is often applied to characterize "bad checks." And, when interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable "understandings."[7]

Equally as important, the Government's interpretation of § 1014 would make a surprisingly broad range of unremarkable conduct a violation of federal law. While the Court of Appeals addressed itself only to check kiting, its ruling has wider implications: it means that any check, knowingly supported by insufficient funds, deposited in a federally insured bank could give rise to criminal liability, whether or not the drawer had an intent to defraud. Under the Court of Appeals' approach, the violation of § 1014 is not the *scheme* to pass a number of bad checks; it is the presentation of one false statement—that is, one check that at the moment of deposit is not supported by sufficient funds—to a federally in-

---

[7] That is particularly true where, as here, it is not immediately clear what "common understanding" would recognize as the implied representation of the act of depositing one's own check. The United States suggests that one who deposits a check represents that he "currently has funds on deposit sufficient to cover the face value." Brief for United States 19. But it would be equally plausible to suggest that many people understand a check to represent that the drawer will have sufficient funds deposited in his account by the time the check clears, or that the drawer will make good the face value of the draft if it is dishonored by the bank. We therefore find "common understanding" a particularly fragile foundation upon which to base an interpretation of § 1014.

sured bank. The United States acknowledged as much at oral argument. Tr. of Oral Arg. 40. Indeed, each individual count of the indictment in this case stated only that petitioner knowingly had deposited a single check that was supported by insufficient funds, not that he had engaged in an extended scheme to obtain credit fraudulently.[8]

Yet, if Congress really set out to enact a national bad check law in § 1014, it did so with a peculiar choice of language and in an unusually backhanded manner. Federal action was not necessary to interdict the deposit of bad checks, for, as Congress surely knew, fraudulent checking activities already were addressed in comprehensive fashion by state law. See Comment, Insufficient Funds Checks in the Criminal Area: Elements, Issues, and Proposals, 38 Mo. L. Rev. 432 (1973). Absent support in the legislative history for the proposition that § 1014 was "designed to have general application to the passing of worthless checks," *United States* v. *Krown*, 675 F. 2d 46, 50 (CA2 1982), we are not prepared to hold petitioner's conduct proscribed by that particular statute.[9]

---

[8] JUSTICE MARSHALL's dissent does not fully respond to this point. That opinion, like the Government's brief, emphasizes that petitioner's "conduct was wrongful," *post*, at 293, and deals only with § 1014's application to check kiting. See also *post*, at 294, 295, 299, 300, and 301. Indeed, the dissent seems to suggest that that statute would not reach the conduct of a defendant who "wrote a check on an account containing insufficient funds with the good-faith intention to deposit in that account an amount that would cover the check before it cleared in the normal course of business." *Post*, at 292. Accepting JUSTICE MARSHALL's theory, however, would bring such conduct within the literal language of the statute, for a "false statement" would have been submitted with the hope of inducing a bank to "advance" funds. While the dissent attempts to avoid this by suggesting that there would be no violation of § 1014 absent an intent "to defraud," *post*, at 301, n. 4, the language of the statute imposes no such intent requirement. And as we emphasize above, we believe that the wording of § 1014 would be a peculiar choice of terms if Congress wished to proscribe such conduct.

[9] JUSTICE MARSHALL's dissent rests entirely on the proposition that petitioner's conduct falls within the "plain language" of § 1014. *Post*, at 293. See also *post*, at 301, 302, and 305–306. In our view, that literally is not

## B

In the 1948 codification of Title 18 of the United States Code, 62 Stat. 683, § 1014 reduced 13 existing statutes, which criminalized fraudulent practices directed at a variety of financial and credit institutions, to a single section. See 18 U. S. C. § 1014, Historical and Revision Notes. Of the originally enumerated institutions,[10] only two—the Reconstruction Finance Corporation, see 15 U. S. C. § 616(a) (1946 ed.), and the Federal Reserve Banks, see 12 U. S. C. § 596 (1946 ed.)—performed duties other than the making of farm and home loans, and neither of those two organizations accepted checks for deposit from private customers. See *United States* v. *Sabatino*, 485 F. 2d 540, 548 (CA2 1973), cert. denied, 415 U. S. 948 (1974); *United States* v. *Edwards*, 455 F. Supp. 1354, 1357 (MD Pa. 1978). It is evident, then, that bad checks were not among the "false statements" or "overvalued property" originally addressed by the statute. While Congress has added and subtracted certain institutions to and from the list covered by § 1014 over the intervening years, no changes have been made in the type of transactions proscribed by the provision.

The legislative history does not demand a broader reading of the statute. The amendments adding institutions to § 1014's list attracted little attention in Congress and were dealt with summarily; at no point was it suggested that the statute should be applicable to anything other than represen-

---

true. And even if one looks to the "common understanding" so emphasized by JUSTICE MARSHALL, *post*, at 296–298, the statute is at best ambiguous, for we doubt that the public typically describes bad checks as "false statements."

[10] These included the Farmers' Home Corporation, the Federal Crop Insurance Corporation, Federal Reserve Banks, the Farm Credit Administration, Federal Credit Banks, the Federal Farm Mortgage Corporation, the National Agricultural Credit Corporation, Federal Home Loan Banks, the Home Owners' Loan Corporation, the Reconstruction Finance Corporation, and related institutions. See 7 U. S. C. §§ 1026(a), 1514(a) (1946 ed.); 12 U. S. C. §§ 596, 981, 1122, 1123, 1138d(a), 1248, 1312, 1313, 1441(a), 1467(a) (1946 ed.); 15 U. S. C. § 616(a) (1946 ed.).

tations made in connection with conventional loan or related transactions. In 1964, for example, when Congress, by Pub. L. 88–353, § 5, 78 Stat. 269, added Federal Credit Unions to the statutory list, § 1014 was described as barring "false statements or willful overvaluations in connection with applications, loans, and the like." S. Rep. No. 1078, 88th Cong., 2d Sess., 1 (1964). Thus, the Senate Committee on Banking and Currency declared that § 1014 "is designed primarily to apply to borrowers from Federal agencies or federally chartered organizations."[11] Id., at 4. Similarly, the first of two 1970 amendments, which added state-chartered credit unions to the statutory list, Pub. L. 91–468, § 7, 84 Stat. 1017, was characterized simply as "relating to false statements in loan and credit applications." H. R. Rep. No. 91–1457, p. 21 (1970).

A second 1970 amendment, Pub. L. 91–609, § 915, 84 Stat. 1815, added banks insured by the Federal Deposit Insurance Corporation, Federal Home Loan Banks, and institutions insured by the Federal Savings and Loan Insurance Corporation, for the first time listing institutions that engaged in commercial checking.[12] But there was no contemporaneous congressional recognition of the substantial expansion of federal criminal jurisdiction that would attend the proscription of bad checks. To the contrary, the Reports accompanying the amendment stated simply that the addition "would describe more explicitly the institutions which are covered by 18 U. S. C. § 1014, which provides penalties for making false statements or reports in connection with loans or other simi-

---

[11] The Committee added ambiguously that the statute "is not, however, limited by its terms to borrowers and would seem also to apply to others, including for example, officers and employees of the agencies and institutions named." S. Rep. No. 1078, 88th Cong., 2d Sess., 4 (1964).

[12] Also added to the list in 1970 were the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation themselves, as well as the Administrator of the National Credit Union Administration. Pub. L. 91–609, § 915, 84 Stat. 1815.

lar transactions." H. R. Rep. No. 91–1556, p. 35 (1970). See H. R. Conf. Rep. No. 91–1784, p. 66 (1970). Congressional debate was directed only at the addition of federally insured savings and loan institutions, which was said to "mak[e] it a Federal crime to submit false data to an insured savings and loan on the true value of a property on which a mortgage is to be granted." 116 Cong. Rec. 42633 (1970) (remarks of Rep. Sullivan).

Given this background—a statute that is not unambiguous in its terms and that if applied here would render a wide range of conduct violative of federal law, a legislative history that fails to evidence congressional awareness of the statute's claimed scope, and a subject matter that traditionally has been regulated by state law—we believe that a narrow interpretation of § 1014 would be consistent with our usual approach to the construction of criminal statutes. The Court has emphasized that "'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *United States* v. *Bass*, 404 U. S. 336, 347 (1971), quoting *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952).[13] To be sure, the rule of lenity does not give courts license to disregard otherwise applicable enactments. But in a case such as this one, where both readings of § 1014 are plausible, "it would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the" deposit of bad checks. *United States* v. *Enmons*, 410 U. S., at 411.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[13] We therefore find it somewhat surprising that JUSTICE MARSHALL's dissenting opinion takes us to task for noting the applicability of the rule of lenity to the interpretation of what we believe to be an ambiguous statute.

JUSTICE WHITE, with whom JUSTICE BRENNAN joins, dissenting.

The majority reverses petitioner's conviction under 18 U. S. C. § 1014 on the grounds that the Government has not shown that he made a "false statement or report" or "willfully overvalue[d] any land, property or security." *Ante*, at 284. According to the majority, a check is not a statement; it is merely an order to the drawee bank to pay the face amount to the payee and a promise to pay the amount of the check upon notice of dishonor. *Ante*, at 284–285. Like JUSTICE MARSHALL, I do not disagree with the majority that under the Uniform Commercial Code a check constitutes an order to the drawee bank and a promise to pay upon notice of dishonor. However, the fact that the Uniform Commercial Code describes a check in this manner does not mean that a check does not carry with it other representations, for the Code does not purport to contain an all-inclusive definition of a check.

It defies common sense and everyday practice to maintain, as the majority does, that a check carries with it no representation as to the drawer's account balance. No bank would give a customer immediate credit for a check drawn on another bank or reduce a check to cash if it did not believe that the check would be paid in the normal course of collection. It could be argued that petitioner did not make a false statement with respect to the May 10 check drawn on the Pelican Bank because he knew the bank would pay the check through its dummy account. However, petitioner does not contend that he had any such arrangement with the Winn Bank, and thus the May 9 check for $58,500 drawn on the Winn Bank, when his balance was $4,649.97, can fairly be said to constitute a false statement. In any event, a properly instructed jury surely found that Williams had made false representations with respect to each of the checks that were the subject of this indictment.

If the majority really means what it says in Part II–A of its opinion—that the Government failed to show that petitioner

made a false statement or overvalued property or security— it is unnecessary to explore the legislative history of § 1014 or to apply the rule of lenity. On the other hand, if the majority reverses the Court of Appeals because it cannot conceive that Congress intended § 1014 to reach the conduct at issue because the area has long been regulated by state law, it is not necessary to employ the fiction that a check does not entail a representation that it will be paid in the normal course of business by the drawee bank. Because the majority opinion appears to me to rest on that fiction, I respectfully dissent. I also join JUSTICE MARSHALL's dissenting opinion.

JUSTICE MARSHALL, with whom THE CHIEF JUSTICE, JUSTICE BRENNAN, and JUSTICE WHITE join, dissenting.

The majority, after developing an overly technical "definition" of the meaning of a check—a definition which will come as quite a surprise to banks and businesses that accept checks in exchange for goods, services, or cash on the representation that the drawer has sufficient funds to cover the check—concludes that the question whether petitioner Williams' check-kiting scheme is covered by 18 U. S. C. § 1014 is ambiguous. The majority then applies its version of the rule of lenity, and decides that Williams cannot be convicted for violating this statute. Because I believe that the majority misapplies the rule of lenity, and because Williams' conduct is clearly prohibited by the statute, I respectfully dissent.

I

Before addressing the application of § 1014 to Williams' conduct, I think that it is helpful to set forth clearly what is *not* involved here. This is not a case in which a defendant, through careless bookkeeping, wrote checks on accounts with insufficient funds. Nor is this a case in which a defendant wrote a check on an account containing insufficient funds with the good-faith intention to deposit in that account an amount that would cover the check before it cleared in the normal course of business. Rather, this case clearly involves

fraudulent conduct. Petitioner Williams engaged in an intentional check-kiting scheme. He misled the first bank into honoring his worthless, or virtually worthless, check and extending him immediate credit. This extension of credit enabled him to "play the float" and cover that check by misleading another bank into extending him credit on an equally worthless check. In effect, Williams was able to obtain interest-free extensions of credit. Williams, who was a bank president, does not, nor can he, make any credible argument that he was unaware that his conduct was wrongful. With this in mind, I turn to the question whether Williams' conduct constitutes a violation of 18 U. S. C. § 1014.

Section 1014 is a comprehensive statute designed to protect the assets of federally insured lending institutions. The Government establishes a violation of this statute by proving that the defendant "knowingly [made] *any* false statement or . . . willfully overvalue[d] *any* . . . property or security, for the purpose of influencing *in any way* the action of [any federally insured bank] upon *any* . . . *advance*, . . . commitment, or loan." 18 U. S. C. § 1014 (emphasis added). Just last Term, we reiterated that "[i]n determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of a 'clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States* v. *Turkette*, 452 U. S. 576, 580 (1981) (quoting *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980)). In my view, the plain language of § 1014 covers the check-kiting scheme practiced by Williams, and nothing in the legislative history of the statute indicates that Congress intended to exclude this type of scheme from the coverage of the statute.

A

The language of § 1014 is sweeping. It embraces numerous entities in which the Federal Government has a financial interest. It proscribes, in the disjunctive, a wide variety of

deceptive schemes that might impair the financial stability of these institutions. Cf. *United States* v. *Naftalin*, 441 U. S. 768, 774 (1979) (disjunctive prohibitions intended to "cover additional kinds of illegalities—not to narrow the reach of the prior sections"). The statute refers broadly to "any false statement or report," and to overvaluations of "any" property or security. The list of transactions to which the statute applies is equally expansive—it covers "any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor." 18 U. S. C. § 1014.

The broad statutory language clearly evinces its legislative purpose—Congress hoped to protect federally insured institutions from losses stemming from false statements or misrepresentations that mislead the institutions into making financial commitments, advances, or loans. The statute was intended to be broad enough "to maintain the vitality of the FDIC insurance program . . . and 'to cover all undertakings which might subject the FDIC insured bank to risk of loss.'" *United States* v. *Pinto*, 646 F. 2d 833, 838 (CA3) (quoting *United States* v. *Stoddart*, 574 F. 2d 1050, 1053 (CA10 1978)), cert. denied, 454 U. S. 816 (1981). This broad language does not lend itself to the restrictive interpretation endorsed by the Court today. Cf. *United States* v. *Culbert*, 435 U. S. 371 (1978).

Nothing on the face of § 1014 "suggests a congressional intent to limit its coverage" to a particular kind of transaction. *United States* v. *Culbert, supra*, at 373. Check kiting, which threatens the assets of federally insured banks in precisely the same way as a misrepresentation in a loan application, should not be excluded from the reach of the statute simply because the terms of the statute and its legislative history do not specifically identify check kiting by name or precise description. This method of statutory construction was

rejected recently in *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 592 (1980):

> "[I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark."

Unfortunately, in my view, the Court's approach to interpreting § 1014 comes dangerously close to the method we rejected in *Harrison.* Unless one accepts the Court's overly restrictive and technical "definition" of a check, check-kiting schemes clearly fall within the broad language of that statute.

## B

As the majority recognizes, a violation of § 1014 is established when the Government proves two elements: that the defendant either made a "false statement or report," or "willfully overvalue[d] any . . . property or security;" and that the defendant did so "for the purpose of influencing in any way the action of [a federally insured institution] upon any application, advance, . . . commitment, or loan." After recognizing this, however, the majority's analysis jumps the track. The majority concludes that when a drawer presents a kited check to a bank with the knowledge that he does not have sufficient funds, and with the intent not to cover that check with anything other than another virtually worthless kited check, he has not made "any false statement or report," or "willfully overvalue[d] any . . . property or security" within the meaning of the statute. In my view, neither of these conclusions withstands analysis.

## (1)

The basis for the Court's conclusion that Williams did not make a "false statement or report" is concededly technical

and "simple": "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Ante,* at 284. This argument proves too much: it would apply equally to material omissions or failures to disclose in connection with loan applications. However, the Courts of Appeals have held that the failure to disclose material information needed to avoid deception in connection with loan transactions covered by § 1014 constitutes a "false statement or report," and thus violates the statute. See, *e. g., United States* v. *Greene,* 578 F. 2d 648, 657 (CA5 1978), cert. denied, 439 U. S. 1133 (1979). I assume that the majority would not disagree with this analysis, which is based on established contract principles. I am at a loss as to why the majority does not apply the same analysis to the transactions at issue in this case.

The majority's description of a check as an "'unconditional promise or order to pay a sum certain in money,'" *ante,* at 285 (quoting the Uniform Commercial Code § 3–104(1)(b), 2 U. L. A. 17 (1977)), is unexceptionable as a conclusory description of "black-letter" law. However, this oversimplified description fails to look behind the bare technical definition of a check. Moreover, this description is not at all inconsistent with the necessary implications that a check carries. "In giving a check, the drawer impliedly represents that he has on deposit with the drawee banks funds equivalent to the face amount of the check." F. Whitney, The Law of Modern Commercial Practices § 341 (2d ed. 1965).[1] Despite the ma-

---

[1] The Court's facile conclusion that Williams made no false statement or misrepresentation when he presented his check to a bank for immediate credit, knowing that the check was not supported by sufficient funds and that he was not going to cover the check before it cleared with anything other than another kited check, is contrary to the theory underlying most prosecutions under state bad check laws. These laws are not based upon the defendant's breach of a contractual promise that he will pay a sum certain upon demand, but upon the fact that in knowingly presenting a bad check the defendant has committed fraud and misrepresentation and can be punished for committing a crime. Brief for United States 20; Brief for Pe-

jority's equivocation on this point, those who write or accept checks in exchange for goods, services, or cash undoubtedly understand that this implicit representation has been made.[2]

---

titioner 28–29, and n. 17. See also F. Whitney, The Law of Modern Commercial Practices § 341 (2d ed. 1965). The Court attempts to avoid the obvious problem this fact presents to its method of statutory interpretation by stating that the federal statute does not apply "in terms" to check kiting, while some state laws do. See *ante*, at 285, n. 6. This reasoning is circular. The *reason* why § 1014 does not "in terms" reach a check-kiting scheme, while certain state laws do, is because the Court *ipse dixit* totally discredits the theory upon which the state laws are premised and refuses to read the terms of the statute in the only manner that is consistent with this theory.

[2] The manner in which the Court manufactures "confusion" over the common understanding of a check is difficult to comprehend. See *ante*, at 286, n. 7. Most of it is totally irrelevant because each of the majority's "common understandings" of the meaning of a check are entirely consistent with prosecuting a check-kiting scheme under § 1014. The majority suggests that the "common understanding" of a check is only that sufficient funds will be present by the time the check clears *or* that the drawer will make good the payment of the face amount of the check if the bank refuses payment. Even if the majority is correct, prosecuting a check-kiting scheme under § 1014 would be justified because the jury found that Williams had intentionally acted inconsistently with each of these understandings.

The jury was specifically instructed that it could not convict unless it found that Williams "made the false statement with fraudulent intent to influence the [bank] to extend [him] credit." App. 37. The judge added that a statement is "false" if it "relates to a material fact and is untrue and is then known to be untrue by the person making it." *Id.*, at 38. The judge further instructed the jury that "[t]he crucial question in check-kiting is whether the defendant intended to write checks which he could not reasonably expect to cover and thereby defraud the bank, or whether he was genuinely involved in the process of depositing funds and then making legitimate withdrawals against them. Hence, proof that the checks were eventually paid might well be pertinent to defendant's initial intent, that is, whether he intended to deceive the bank." *Ibid.* Therefore, the jury was clearly instructed to acquit Williams if he had shared with the Court even its most lenient and unrealistic interpretation of the implied representation made when one presents a check. The jury had to find that Williams had given the bank the kited check with the express intent not to actually cover the check, but only to receive this extension of credit for as long as the check-kiting scheme continued.

A check is accepted with the expectation that it will be paid in the normal course of collection. A banker who knew that the drawer did not have funds on deposit would not credit the check to the drawer's account or reduce it to cash. Regardless of any contractual breach also involved in check kiting, a person who writes a series of checks knowing that there are no funds to cover them has made intentional false representations within the reach of § 1014.

Any other view, including that endorsed by the Court today, would interfere with the manner in which a major portion of commercial transactions are conducted in our society today. Williams was charged with, and the jury convicted him of, making a false representation (or, more precisely, a material omission) when he presented his check to the bank with the knowledge that he did not have sufficient funds to cover the check, and with the further intent not to cover that check before it cleared with anything other than another worthless kited check. See n. 2, *supra*. Therefore, his conviction under § 1014 should stand.

### (2)

In addition to violating § 1014 by intentionally making a false statement to a federally insured bank for the purpose of obtaining credit, Williams also violated the statute for a separate and independent reason. Although Williams presented to the bank for immediate credit a check which on its face represented an amount exceeding $50,000, he well knew that in fact the check was virtually worthless. In so doing, he "willfully overvalue[d] . . . property or security" for the purpose of obtaining credit.[3] The Court's rejection of the Gov-

---

[3] Section 1014 applies to the willful overvaluation of "any . . . property, or security." Again, this element of the statute is cast in broad rather than restrictive terms. Congress plainly intended to proscribe the willful overvaluation of anything of value given to a lending institution. There is no suggestion that the broad generic terms "any . . . property or security"

ernment's argument with respect to this issue is startling in both its brevity and its concededly technical and "literal" interpretation of the legal value of a check which completely ignores the meaning attributed to checks in the real world.

The very essence of a check-kiting scheme is the successful overvaluation of a security or property which misleads a bank into issuing immediate credit on the assumption that the security or property is in fact valued at the amount represented on its face. A check-kiting scheme is successful only when the bank to which the check is presented assumes that the check is supported by adequate funds in the account upon which it is drawn, and that the face amount of the check is in fact its value. See *supra*, at 296–298; *United States* v. *Payne*, 602 F. 2d 1215, 1217–1218 (CA5 1979). If the bank does not accept the valuation on the face of the check, and instead either inquires into the status of the account on which the check is drawn or waits until the check clears before paying the face amount of the check, the scheme will collapse. Of course, it would be more prudent for a bank to take such precautions just as it would be prudent for banks to inquire carefully into the accuracy of all representations made concerning the value of collateral pledged as security for conventional loans. However, this more prudent course is not always practicable. Moreover, the bank may not believe that such precautions are necessary where, as here, the person presenting the check is the president of another bank presumed to know the illegality, and the drastic adverse conse-

---

were meant to exclude items such as checks presented to obtain a temporary extension of credit. There is no reason to interpret this language to exclude checks.

A check is plainly a form of property under even the majority's most restrictive definition—it is a demand to a drawee to pay a sum certain of money, which is backed by a promise of the drawer to make payment in the event of default. Furthermore, as evidenced by other provisions of Title 18, including the general definitional section, 18 U. S. C. § 8, a check is a type of "security." See, *e. g.*, 18 U. S. C. § 2311.

quences to a bank, of a check-kiting scheme.   In any event, a bank's failure to take all possible precautions does not bar prosecution under § 1014, which places the burden of avoiding false representations, at the risk of criminal prosecution, upon the person who seeks the funds of the federally insured bank.   Section 1014 forbids a person seeking such funds to make "any" false statement or to "willfully overvalue" any security or property to obtain use of the bank's funds.   A kited check is "willfully overvalued" within the meaning of the statute, just as worthless securities presented as collateral for a loan are "willfully overvalued."   See *United States* v. *Calandrella*, 605 F. 2d 236 (CA6), cert. denied *sub nom. Kaye* v. *United States*, 444 U. S. 991 (1979).

(3)

The Court does not question that the second element of a § 1014 violation—that Williams presented his kited check for the purpose of influencing the bank to extend him credit in the form of a loan or an advance—is satisfied in this case. Clearly, Williams' conduct was directed at misleading a bank into extending immediate credit.   Indeed, the whole purpose of Williams' kiting scheme was to obtain an immediate extension of credit by depositing a check purportedly supported by adequate funds.   The banks that extended funds on the basis of Williams' worthless, and not yet collected, checks made an "advance," a "loan," and a "commitment" within the ordinary meaning of these terms.   See, *e. g., United States* v. *Payne, supra,* at 1218 (check kiting has effect of inducing a credit, a loan, or an advance); *United States* v. *Street,* 529 F. 2d 226, 229 (CA6 1976) (check kiting is the obtaining of "forced credit"); J. White & R. Summers, Uniform Commercial Code 558 (2d ed. 1980); F. Whitney, *supra* n. 1, § 310, pp. 451–452.

If a worthless check is submitted to a bank for reasons other than to obtain an extension of credit, the conduct simply is not check kiting in the ordinary sense of the term, and

would not fall within the prohibition of § 1014.[4]   However, if a properly instructed jury concludes that a worthless check was submitted in order to obtain immediate credit from a bank, there is no reason to regard the conduct as falling outside the reach of § 1014.   The jury that convicted Williams was so instructed, see n. 2, *supra*, and found that Williams' conduct constituted a "false representation" designed to influence the banks into extending him immediate credit.

## C

The unambiguous language of § 1014 clearly proscribes conduct commonly referred to as check kiting.   This language should be given effect in the absence of clear indications in the legislative history that Congress did not intend to proscribe this conduct.   See *United States* v. *Turkette*, 452 U. S., at 580.   There are no such indications in the legislative history.   To the contrary, the legislative history makes clear that the statute was not limited to borrowers or to loan applications.   See S. Rep. No. 1078, 88th Cong., 2d Sess., 4 (1964); H. R. Conf. Rep. No. 91–1784, p. 66 (1970).

The Court finds no indication that Congress intended to exclude check-kiting schemes from the scope of the statute. The Court's brief review of the legislative history to § 1014 does suggest that the primary purpose of the statute is to prohibit misrepresentations in connection with conventional loan applications.   However, neither this fact, nor the fact that most convictions under the statute involve such transactions, compels the Court to ignore the broad language and

---

[4] The Court's fears that holding a check-kiting scheme to be covered by § 1014 would entail broad implications, see *ante*, at 286–287, are misguided. If there was no intent on the part of the check kiter to defraud the bank into extending credit, there would be no § 1014 violation.   The fact that the Government brought separate counts for each check in the check-kiting scheme does not alter the fact that it was essential to conviction under the jury instructions for the jury to find that petitioner was involved in a check-kiting scheme intentionally designed to defraud the banks.

purposes of the statute by interpreting it to cover *only* these transactions. In the past, we have consistently rejected the argument that a criminal statute must be given its narrowest meaning by limiting its scope to effectuate only its primary purpose. See, *e. g.*, *United States* v. *Turkette, supra; United States* v. *Naftalin*, 441 U. S. 768 (1979); *United States* v. *Moore*, 423 U. S. 122 (1975).

## II

In light of the broad protection Congress intended to accord federally insured institutions against fraudulent or deceptive conduct intended to mislead these institutions into extending credit and the broad, unrestricted statutory language embodied in § 1014, I marvel at the Court's method of interpreting this statute. Indeed, today's decision is utterly incompatible with a number of prior decisions of this Court in which we addressed similar arguments raised by persons convicted under broad federal statutes. See, *e. g.*, *United States* v. *Turkette, supra; Rubin* v. *United States*, 449 U. S. 424 (1981); *United States* v. *Naftalin, supra; United States* v. *Culbert*, 435 U. S. 371 (1978). In these decisions, we have consistently looked first to the statutory language to determine the scope and purpose of the statute. If it were evident from the face of the statute that the statute was written broadly in order to prohibit certain kinds of conduct which entail specific risks or dangers deemed by the legislators to be sufficiently unacceptable to warrant criminal sanction, we do not frustrate this purpose by distorting either the statutory language employed or the conduct of the accused in the name of the "rule of lenity." See, *e. g.*, *United States* v. *Turkette, supra; Rubin* v. *United States, supra.*

In contrast with this established approach, the majority today interprets § 1014 without acknowledging the broad statutory language chosen by Congress. This error is compounded by the Court's failure to address the fact that this broad language was intended to proscribe, in generic and dis-

junctive terms, precisely the type of conduct of which Williams was found guilty—intentionally misleading the bank into extending him credit—and to protect federally insured institutions from precisely the risk of loss to which Williams' conduct subjected them. Ignoring these factors, the majority begins its analysis by employing an oversimplified, concededly technical and literal interpretation of the "legal definition" of a check. In then observes that Congress never explicitly stated that it intended the statute to cover check-kiting schemes. It concludes that in the absence of such an express statement, the rule of lenity requires that the statute not cover these schemes.

The majority's approach to the question of statutory construction is a prime example of what this Court has time and again said the rule of lenity does *not* entail:

> "The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language. As was said in *United States* v. *Gaskin*, 320 U. S. 527, 530, the canon 'does not require distortion or nullification of the evident meaning and purpose of the legislation.' Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers." *United States* v. *Brown*, 333 U. S. 18, 25–26 (1948) (quoted in *United States* v. *Turkette, supra*, at 588, n. 10, and *United States* v. *Moore, supra*, at 145).

If the broad language and evident purpose of the statute had been given effect, there would have been no need to parse the legislative history for affirmative evidence that Congress "demand[ed] a broader reading of the statute." *Ante*, at 288. Holding that § 1014 reaches check kiting does

not produce an absurd result, render the statute internally contradictory, or diverge from legislative policy. To the contrary, Congress' policy, manifest in § 1014 and elsewhere throughout Title 18 of the United States Code, is that federal criminal sanctions are necessary to provide federally insured banking institutions with comprehensive protection against practices that cause risk of loss. The Court's construction of § 1014, on the other hand, results in a large loophole in the protection afforded these institutions by limiting the statute's application to formal loan transactions. After today's decision, a bank's protection against false statements intended to influence credit transactions depends not upon whether a misrepresentation was made in connection with a loan, advance, or commitment, but rather upon whether a court concluded that the transaction was "traditional" or that Congress specified that transaction by name in a committee report.

It is worth observing that in this case, none of the general justifications for applying the rule of lenity are present. In *Huddleston* v. *United States*, 415 U. S. 814, 831 (1974), this Court explained that the rule of lenity "is rooted in the concern of the law for individual rights, and in the belief that fair warning should be accorded as to what conduct is criminal and punishable by deprivation of liberty or property." There is no question that Williams, a bank president, knew that his check-kiting scheme was wrongful. The majority's attempt to buttress its decision by arguing that check kiting has traditionally been regulated by the States, and that federal enforcement might interfere with this regulation, is completely unjustified.[5] The Federal Government, which pro-

---

[5] In Title 18, Congress has provided comprehensive criminal sanctions to protect federally insured institutions. See, *e. g.*, 18 U. S. C. §§ 212, 213 (loans or gratuities offered to bank examiners by bank officials; acceptance of same by examiners); 18 U. S. C. § 493 (forging, counterfeiting, or

vides deposit insurance, has a paramount interest in safeguarding the financial integrity of federally insured banking institutions. The Courts of Appeals have been virtually unanimous in holding that check kiting is subject to federal prosecution under the mail and wire fraud statutes, see, e. g., *United States* v. *Giordano*, 489 F. 2d 327 (CA2 1973); *United States* v. *Constant*, 501 F. 2d 1284 (CA5 1974), cert. denied, 420 U. S. 910 (1975), and the majority apparently does not question these decisions. Therefore, a check-kiting prosecution under § 1014, which by its terms applies only to federally insured institutions, results in no new inroad upon state criminal jurisdiction.

Under the version of the rule of lenity adopted today, conduct which falls within the literal terms of a broad statute, which proscribes in disjunctive and generic terms the type of conduct at issue, and which is designed to protect against the very risk created by such conduct, escapes the reach of the statute unless Congress specifies that conduct by name in the statute or describes it in detail in the statute's legislative his-

---

passing bonds and obligations); 18 U. S. C. § 656 (theft from banks by bank examiners); 18 U. S. C. § 709 (1976 ed. and Supp. IV) (false advertising that bank deposits are insured by Federal Deposit Insurance Corporation). Congress has sought to protect fully the integrity of the federal insurance program, and the protection against check kiting afforded by § 1014 is consistent with this scheme. See, e. g., *United States* v. *Bush*, 599 F. 2d 72, 75 (CA5 1979); *United States* v. *Pinto*, 646 F. 2d 833, 838 (CA3), cert. denied, 454 U. S. 816 (1981); *United States* v. *Stoddart*, 574 F. 2d 1050, 1053 (CA10 1978). Construing § 1014 to cover check kiting does not displace the authority of the States. Rather, it complements state law enforcement in an area where the federal interest is substantial. See *United States* v. *Turkette*, 452 U. S. 576, 586, n. 9 (1981) (interpreting the Racketeer Influenced and Corrupt Organizations statute) ("[T]he States remain free to exercise their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions. That some of those crimes may also constitute [violations of federal law], is no restriction on the separate administration of criminal justice by the States").

tory. In order to find Williams' conduct outside the scope of § 1014, the majority ignores the function of a check in today's society. The rule of lenity has never been interpreted to require this kind of result. I am at a loss to explain why the Court adopts this approach today and consequently turns the rule of lenity on its head. Accordingly, I dissent.