OPINION OF THE COURT
Carol Berkman, J.
The defendants, indicted for the crimes of scheme to defraud in the second degree by means of false and fraudulent pretenses and representations (Penal Law § 190.60) and two counts of grand larceny in the second degree (Penal Law § 155.35) have moved for inspection of the Grand Jury minutes and dismissal of the indictment. The People have consented to an in camera review of the minutes by the court.
The grand larceny counts, properly, do not specify the manner of the unlawful taking (Penal Law § 155.45). The scheme to defraud count, however, recites that by means of a "check-kite”, the defendants "created the false appearance of substantial multi-million dollar balances in each account” on which two banks, Citibank and Marine Midland Bank, N. A., relied in permitting the defendants to withdraw in excess of $23,000,000.
On this motion to inspect and dismiss pursuant to CPL 210.30, the defendants assert that they have committed no crime at all: that they are not guilty of larceny by bad check because they fully expected each check to be honored; that they were not guilty of larceny or scheme to defraud by false pretenses because a check is a statement of nothing and cannot, therefore, constitute a misrepresentation of a past or existing fact; that larceny cannot be accomplished in any manner not enumerated in Penal Law § 155.05 (2) and there is no other subdivision of that statute which applies to this case; that the absence of an intent to permanently deprive is conclusively demonstrated, they argue, by the fact that all the money was subsequently repaid; and that there was no larceny at the times alleged by the People because at each point that funds were withdrawn from one bank, that bank had a "credit” from the other and was accordingly deprived of nothing. The court declines to take this trip through the looking glass. The evidence before the Grand Jury, unless explained or refuted, shows behavior by the defendants which *903 was both morally reprehensible and prohibited by the Penal Law. The motion to dismiss is denied.[1]
Nonetheless, the very fact that the defense arguments have some superficial viability shows a need for legislative attention to the modern problem of check-kiting. When behavior looks, feels, smells, and sounds so thoroughly larcenous as does this elaborate, protracted and enormous scheme of check-kiting, there should be no need even to stop and reflect whether that behavior is indeed against the law.
THE EVIDENCE BEFORE THE GRAND JURY
The check-kite began after Citibank announced in the fall of 1983 that it would no longer tolerate overdrafts on the account of Transit Mix, a company owned by defendants. Thereafter, at Citibank’s demand, there were daily discussions between the bank and a Transit Mix employee (mostly Grace Furst). No one who testified had an exact recollection of the conversations, but the gist was that Citibank and Furst were to discuss daily a list of the outstanding checks for the day and whether there were sufficient funds in the account to cover them. During the period covered by the indictment there always appeared to be good funds to cover all the checks drawn.
At the same time, Water Tunnel Associates, a joint venture of Transit Mix and Certified Industries, had an account at Marine Midland Bank. A number of defendant Halloran’s other enterprises also had accounts at Marine Midland, and Halloran subscribed to "Marine Lines”, a computer hookup which permitted him instant access to all information about his accounts. Water Tunnel Associates had ceased active business operations in June 1982, and from at least January 1983, when the check-kiting began, no checks from any source other than the Citibank Transit Mix account were deposited into the Marine Midland Water Tunnel account.
From January 1983 to March 1984, when Marine Midland and Citibank closed the two accounts, a total of 7,445 checks were drawn on the Marine Midland account, almost all of which were signed by Madden. (The 23 exceptions were signed by Madden’s son.) There were 2,523 checks deposited in the Marine Midland account, almost all of which were signed by Halloran, the president of Transit Mix.
*904 The checks, totaling over $9,000,000,000, were drawn and deposited in ever-increasing numbers, and in ever-increasing but varying amounts. This is characteristic of a "check-kite”, as a large number of transactions serves to delay discovery of the check-kiting scheme. Thus, in January 1983, 57 checks were drawn on the Water Tunnel account; in March 1984, the number was 1,352. The number of deposits also increased in amount and each day’s deposits were made at a number of branches, which also made detection more difficult. For example, in March 1984, 464 deposits were made on 19 business days at varying branches and with different tellers. There was also a correspondence, on a daily basis, of the amounts drawn from one account and those deposited into the other.
The rapid exchange of checks between Citibank and Marine Midland created a "float”, that is the appearance of a positive balance in each account. The truth, shown on the books of Transit Mix and Water Tunnel, was that the balance in each account was negative. In March 1983, the Water Tunnel bank balance appeared to be approximately $52,000. One year later, the apparent balance was $23,000,000. The reason for this disparity between appearance and reality was that checks deposited received immediate credit to the account. Those drawn on the account took about two days to clear. Thus, the "float” was created and kept going and growing by the continuous circulation of checks between the two accounts.
At Madden’s direction, Pellizzi, the accountant and comptroller for Transit Mix, was in charge of making these various transfers. Each day, Pellizzi directed the bookkeepers to make up checks in random amounts so as to come up with the required total. Pellizzi then brought these checks — possibly hundreds in one day — to Halloran for signature. Indeed, Halloran also sometimes signed large numbers of checks in blank. Pellizzi claimed to be disturbed by the "float” created by this transfer of checks and said he discussed the problem at various times with both Madden and Halloran, each of whom reassured him. However, it was only Madden who directed Pellizzi to draw up the checks to entities other than Water Tunnel. The largest single recipient was 522A/Transit Mix Cement.[2] A number of other checks were payable to Halloran, or one of his relatives, or one of his business enterprises. Approximately $125,000 was payable to Madden. It is the *905 People’s position that a larceny occurred each time funds were withdrawn from the kite cycle, that is each time a check was made payable to a person or entity other than Water Tunnel or Transit Mix.[3]
In late 1983, Citibank realized it was still losing money on the Transit Mix account, though the bank’s ledger showed a positive balance. In February 1984, a Citibank computer run showed the bank what was happening. There were meetings in March 1984, at which Madden and his son offered a purportedly "legitimate” explanation of why the funds were going back and forth between the Citibank and Marine Midland accounts. Citibank nonetheless closed the Transit Mix account, leaving Marine Midland holding the bag for a loss of in excess of $23,000,000, the amount of funds which had been withdrawn from the kite cycle. Within a week thereafter, Madden and Halloran met with Marine Midland. Halloran’s lawyer explained that the money had been used for various Halloran enterprises. An agreement in "full satisfaction” of this "overdraft” (plus interest and fees) was arrived at, secured by certain real property (albeit Marine Midland had previously refused to give a loan secured by at least some of the property included in this agreement). The agreement called for payment within 120 days. About six months later, the real estate was sold profitably, and Marine Midland was paid.[4]
THE PEOPLE’S POSITION
In their bill of particulars, the People assert three alternative theories of larceny. One, larceny by bad check (Penal Law § 155.05 [2] [c]; § 190.05) is quickly disposed of, since Penal Law § 190.05 (1) requires that the defendant intend or believe that payment will be refused by the drawee and that payment actually be refused. The very essence of a check-kite is that the drawee bank will be fooled into honoring the checks *906 presented notwithstanding that the account in actuality has insufficient funds. The People’s evidence shows that extraordinary efforts were taken to avoid having the checks dishonored and conclusively refutes the presumption of intent and/or belief contained in Penal Law § 190.10 (2) (b). The argument that the defendants should not be protected from prosecution by the success of their fraud is one which must be presented to the Legislature, not the courts.
The People’s other theories, larceny by false pretense and larceny by some theory of wrongful taking not specifically set forth in Penal Law § 155.05 (2), require more extensive discussion.
A preliminary issue may be disposed of quickly. The Grand Jury was instructed as to larceny generally and specifically as to larceny by false pretenses and larceny by bad check. The charge gave the Grand Jury sufficient information to decide intelligently whether the defendants should be charged with larceny. (People v Calbud, Inc., 49 NY2d 389, 394-395 [1980].) Moreover, the larceny statute requires only a wrongful taking and the form of the taking is not a material element of the crime (Penal Law § 155.45 [2]; People v Spann, 56 NY2d 469 [1982]). Thus, the errors, if any, in the People’s charge as to the forms of larceny to be considered do not require re-presentation of this case.
LARCENY BY FALSE PRETENSES; SCHEME TO DEFRAUD BY FALSE PRETENSES
False pretenses are false statements of a past or existing fact, made with knowledge of their falsity and an intent to defraud, which are relied on by the victim when he gives the defendant property. (See, 32 Am Jur 2d, False Pretenses, § 3; 2 Callaghan, Criminal Law in New York § 24:15 [3d ed].)
As the People argue, there are many cases to support the proposition that the tendering of a check is an implied representation that at the time of presentation there are sufficient funds in the account to cover the check (e.g., Heuertematte v Morris, 101 NY 63, 70 [1885]).[5] The People vigorously argue that this rule has survived New York’s adoption of the Uni *907 form Commercial Code (UCC), which defines a check as an order to pay directed to the drawee, and a promise by the drawer to pay the amount of the draft upon dishonor. (UCC 3-104, 3-413 [2].) The People do not so argue, but it appears the UCC, effective in 1964, simply continued prior law in this respect.[6] Thus it may not be significant that the cases relied upon by the People for this issue all precede 1962.
However, these provisions of the UCC, clear enough on their face in any event, were interpreted in Williams v United States (458 US 279 [1982]). While Williams involves the application of a Federal statute (18 USC § 1014) making it a crime knowingly to make a false statement in connection with a bank application, the decision required an analysis of Louisiana’s UCC, which is identical in all pertinent respects to our own.
Williams had engaged in a relatively small series of transactions "seemingly amounting] to a case of 'check kiting.’ ” (458 US, at p 281.) The essence of the charges, however, was that the presentation of a single check amounted to a representation that the check was of a value equal to its face amount. (458 US, at p 283, n 3.) The Supreme Court concluded that the "course of conduct” of depositing "several checks” unsupported by sufficient funds did not involve the making of a " 'false statement’ ” because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true’ or 'false.’ * * * Each check did not, in terms, make any representation as to the state of petitioner’s bank balance.” (458 US, at pp 284-285.)
The Government’s argument in Williams (supra) of a " 'common understanding’ ” of an implied representation that a check is supported by sufficient funds was squarely rejected. The court pointed out that "it would be equally plausible to suggest that many people understand a check to represent that the drawer will have sufficient funds deposited in his account by the time the check clears, or that the drawer will make good the face value of the draft if it is dishonored by the bank.” (458 US, at p 286, n 7.)
The People are correct in arguing that the Supreme Court’s interpretation of State law as it applies to a Federal statute is not controlling here. But a nisi prius court may not simply disregard the Supreme Court’s reading of a statute intended *908 "to make uniform the law among the various jurisdictions.” (UCC 1-102 [2] [c]; Horn Waterproofing Corp. v Bushwick Iron & Steel Co., 66 NY2d 321, 327, n 6 [1985].) The People cite only two State court cases discussing Williams v United States (supra) and each rejects its conclusion without real explanation. (People v Young, 130 Ill App 3d 317, 473 NE2d 974 [1985]; State v Williams, 134 Ariz 411, 656 P2d 1272 [1982].) Indeed, Young (supra) does not explicitly refuse to follow Williams v United States. The Arizona Court of Appeals in State v Williams (supra) cites as authority the dissenting opinion in Williams v United States (supra). Neither State decision discusses the Uniform Commercial Code.
Parenthetically, it is not entirely clear under New York law prior to the UCC that a check unsupported by sufficient funds was a false statement. As noted previously, the pertinent UCC provisions did not materially change the definition of a check. Indeed, the Practice Commentaries contain the following, rather cryptic, discussion of the issue "[although [obtaining money by means of fraudulent checks] doubtless constitutes larceny by false pretenses in most instances, it is debatable whether many of such transactions truly fall within that category or within any of the other three traditional forms of larceny.” (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 155.05, p 114.)
Contrary to the People’s argument, it proves nothing that the Supreme Court in Williams stated, without the usual exhaustive listing of the law of the various jurisdictions, that bad checks are a subject "traditionally” regulated by State law. (458 US, at p 290.) While bad checks have long been with us, check-kiting is a modern crime not specifically anticipated by traditional legislation. The People argue that People ex rel. Grillo v Holtzman (91 AD2d 983 [2d Dept], affd on opn below 58 NY2d 934 [1983]) is "dispositive” because the decision concludes that taking by check-kiting is larceny, but Grillo is also not helpful with the issue before this court. The Grillo opinion (supra) does not describe what kind of larceny was committed and, in any event, there are any number of factual and procedural differences between Grillo and this case.
On the other hand, two other factors noted by the Supreme Court in Williams (supra) are of crucial significance. The court was concerned that the Federal statute involved in Williams required no fraudulent intent; larceny by false pretenses does. And the court also specifically noted that what was involved in the Williams prosecution was "not the scheme to pass a *909 number of bad checks [but] the presentation of [a single check] [unsupported by sufficient funds * * * at the moment of deposit” (458 US, at p 286). In this case, unlike Williams, there was evidence, more than sufficient for Grand Jury purposes, that defendants "engaged in an extended scheme to obtain credit fraudulently.” (458 US, at p 287.)[7]
The false statement required for larceny by false pretenses need not be verbal but may be implicit in conduct (e.g., People v Rosenstein, 92 Misc 2d 1069, 1071 [Sup Ct, Suffolk County 1978]). Normally, conduct may be too ambiguous to support a prosecution for larceny by false pretenses: before one can determine whether a "statement” is false, one must determine what the statement is. Here, the statement intended was clearly what the bank statement showed, i.e., that there were large positive balances in each account. The "statement” was made not by presenting a single check, but by presenting thousands of checks, by depositing them at various branches and with various tellers and in various arbitrary amounts, by agreeing at the outset to abide with Citibank’s terms when it determined not to extend any credit, and by causing an employee to participate daily in conversations with a Citibank employee so as to convey the impression that there was continued obedience to Citibank’s conditions.
This was no mere willful failure to disclose, which would not constitute false pretenses (e.g., People v Soto, 76 Misc 2d 491, 495 [Crim Ct, Bronx County 1974, Milonas, J.]), but a deliberate, active, creation of a false appearance. If indeed an explicit statement is needed, then there is one in this case: the evidence shows that the defendants caused the complainant banks, as innocent dupes, to make the misstatements of fact to themselves, so that the banks’ ledgers showed positive balances when the balances were in fact negative. Under these circumstances, the defendants are liable for the statements which they caused the banks to make. (See, People v Sadacca, 128 Misc 2d 494, 498-499 [Sup Ct, NY County 1985, Rothwax, J.].)
LARCENY BY A METHOD NOT SPECIFIED IN PENAL LAW § 155.05 (2)
Penal Law § 155.05 (1) defines larceny generally as a wrong *910 ful taking of property with intent to deprive, and Penal Law § 155.05 (2) provides that "[ljarceny includes a wrongful taking * * * committed in any of the following ways” (emphasis supplied). The People argue that the word "includes” implies that the listing in Penal Law § 155.05 (2) does not exclude other unlisted means of wrongful taking. This approach was approved in dictum in People v Silverman (106 Misc 2d 468 [Sup Ct, NY County 1980, Altman, J.]), which relied on a statement in People v Keeffe (50 NY2d 149, 155 [1980]), that "[l]arceny is committed when one wrongfully takes * * * (Penal Law, § 155.05, subd 1), or* * * takes * * * by 'common law larceny by trespassory taking’ (subd 2)” (emphasis supplied).
The dictum of Silverman (supra) is not supported by the history of the larceny statute or by any other case. The issue in Keeffe (supra) was not the form of larceny committed, but whether there had been a taking from the owner. Similarly, in People v Alamo (34 NY2d 453, 459-460 [1974]), the reference to the "broad terms” of Penal Law § 155.05 (1) was made in the context of determining when the "taking” was consummated, and not the form of the taking. In People v Firestone (111 AD2d 696 [1st Dept 1985]), the trial court had charged that a taking could be wrongful if it violated the Martin Act (General Business Law § 352-c [2]), and the People argued in the Appellate Division that the conviction for a wrongful taking could be sustained under Penal Law § 155.05 (1). The affirmance of the conviction cannot be read as indorsing the People’s position, however, because the Martin Act essentially prohibits misrepresentations and false promises to investors. In fact, in affirming the conviction, the Appellate Division noted that the defendants had "falsely represented to investors that the programs would mine large amounts of coal” (111 AD2d, at p 698).
While the modern trend is certainly toward a broader reading of penal statutes (e.g., Penal Law § 5.00) the crime of larceny has historically been particularly narrowly and technically defined. (See, Fletcher, The Metamorphosis of Larceny, 89 Harv L Rev 469 [1976].) Originally, only a trespassory taking was a larceny, and it was only by slow and torturous steps, with heated arguments as to whether the wrongs should be considered civil or criminal (e.g., People v Haynes, 14 Wend 546 [1835]), that other forms of larceny were recognized. It is in this context that one must read the language of People v Karp (298 NY 213, 216 [1948]) that the similarly broad lan *911 guage of the predecessor statute to Penal Law § 155.05 "was not * * * designed to, and did not, broaden the scope of the crime of larceny or designate as criminal that which was previously innocent.” There is no indication in the legislative history of or the Practice Commentary to Penal Law § 155.05 that it was intended to overrule Karp (supra).
For the foregoing reasons, the motion to dismiss the indictment is in all respects denied.

. The denial is on grounds somewhat different than urged by the People in their various memoranda of law but is still consistent with the theory set forth in the People’s bill of particulars.

. 522A Associates had a bank account and did business in 1983 and 1984 as part of Transit Mix.

. Initially, the People’s bill of particulars asserted that "property was obtained on each day of the check kite * * * in the amount of the face value of the kited check which had been deposited”. Those particulars have been amended by subsequent submissions, particularly the Assistant District Attorney’s letter to the court of December 26, 1985.

. The defendants argue that the evidence establishes that they always intended to repay the money and therefore lacked the requisite intent to permanently deprive. But the "simple hope or expectation” of repayment, without the present ability to do so, will not defeat a larceny prosecution. (People v Shears, 158 App Div 577, 580 [2d Dept 1913].) At best for the defendants, this issue will present a jury question.

. Since false pretenses require the misrepresentation of a past or existing fact, an implied representation that there will be funds by the time the check clears, a future fact, would not analytically support a prosecution for larceny by false pretenses although perhaps it might support larceny by false promise, which is by statute more difficult to prove (Penal Law § 155.05 [2] [d]).

. For example, former Negotiable Instruments Law §321 defined a check as a bill of exchange drawn on a bank and payable on demand.

. It may be that cases such as United States v Frankel (721 F2d 917 [3d Cir 1983]) (extending the Williams v United States, 458 US 279, rationale to the Federal mail fraud statute [18 USC § 1341]) can be explained purely on pleading grounds, i.e., that the Government was relying on the single presentation of a check. To the extent that the holdings of this line of cases are broader, this court declines to follow them.