293 B.R. 724 (2002)
In re Gregory/Melissa GRILLIOT, Debtors.
Busch, Inc., Plaintiff,
v.
Melissa Grilliot, Defendant.
Nos. 02-3034, 02-30168.
United States Bankruptcy Court, N.D. Ohio.
September 19, 2002.
*725 *726 Steven M. Burke, Sylvania, OH, for Plaintiff.
Beryl W. Stewart, Wayne, OH, for Defendant.

DECISION AND ORDER
RICHARD L. SPEER, Bankruptcy Judge.
This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability and the Defendant's Counterclaim thereto. The gravamen of the Parties' dispute centers on whether a check, written on the Defendant's account for Nine Thousand Six Hundred and 11/100 dollars ($9,600.11) and later returned marked NSF, was issued by the Defendant with no expectation that there would ever be sufficient funds in the account to cover the indebtedness. The statutory authority upon which the Plaintiff bases its cause of action is 11 U.S.C. § 523(a)(2)(A) which provides:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title *727 does not discharge an individual debtor from any debt 
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by 
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]
In turn, the Defendant's counterclaim is based, in substance, on fraud for the Plaintiff's alleged misrepresentation concerning the amount that would be charged for the goods and services supplied by the Plaintiff. In addressing the claims brought by the Parties, the Court will begin by setting forth the relative facts of this case.
In July of 2001, the Defendant's husband, who operated his own contracting business known as "R & B Construction," entered into an agreement to dig a pond. In order to fulfill this obligation, the Defendant's husband contracted to rent certain pieces of digging equipment from the Plaintiff. As security for this transaction, the Defendant's husband, who was a new customer, was required to submit a blank check to the Plaintiff which, according to a representative of the Plaintiff, was a standard business practice at this time for new customers.
On July 23, 2001, the Defendant's husband, as required, delivered a blank check to the Plaintiff. As it pertains to this check, the undisputed facts of this case revealed a number of things: First, the check, which was signed by the Defendant as the drawer, was issued from an account maintained solely by the Defendant, and not the Defendant's husband. Second, contemporaneous to the time the Defendant issued the check, her account, which never had significant sums of money in it, was frequently overdrawn due to difficulties with a restaurant business. Third, the Defendant's husband, not the Defendant, filled in the Plaintiff as the named payee.
On July 24, 2001, the Plaintiff delivered the rental equipment according to the terms of its agreement with the Defendant's husband. (Plaintiff's Exhibit G). This equipment was then picked up by the Plaintiff on September 5, 2001. Based upon the length of this rental period, the Plaintiff then issued an invoice in the amount of Nine Thousand Six Hundred and 11/100 dollars ($9,600.11), after which point the Plaintiff, after filling in the invoice amount, attempted to negotiate the blank check signed by the Defendant. (Plaintiff's Exhibit E). On or about September 25, 2001, however, this check was returned marked NSF. (Plaintiff's Exhibit A). Thereafter, in an attempt to rectify this matter, the Plaintiff sent a letter to R & B Construction regarding the nonpayment of the account, after which time the Defendant's husband made three payments on the account: a payment of $500.00 on October 10, 2001; a payment of $100.00 on October 11, 2001; and a payment of $100.00 on October 18, 2001. (Plaintiff's Exhibit B & Joint Exhibit No. 1). At the same time, the Plaintiff, on October 18, 2001, sent a letter to the Defendant regarding the possibility that legal action would be taken against her if the check was not made "good" within 10 days. (Plaintiff's Exhibit C). However, the possibility of any legal action was eventually foreclosed when, on January 14, 2002, both the Defendant and her husband filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code.
At the Trial held in this matter, neither of the Parties disputed the veracity of the above-stated facts. However, beyond these facts there exists an entirely different account of events. On the one hand, the Defendant's husband put forth to the *728 Court that it was his agreement with the Plaintiff that his lease of the Plaintiff's digging equipment would only be about one week in duration. Furthermore, based upon this time period, it was his understanding that he would owe the Plaintiff approximately Two Thousand One Hundred dollars ($2,100.00). As it pertains to this understanding, the Defendant's husband testified as follows:
First, approximately one week after he received the rental equipment, the Defendant's husband stated that he notified a representative of the Plaintiff that the equipment could be picked up. Second, the Defendant's husband testified that he was only charging the property owner Eight Thousand dollars ($8,000.00) to dig the pond, well under the Nine Thousand Six Hundred and 11/100 dollars ($9,600.11) eventually invoiced by the Plaintiff. Finally, and although he was not able to completely dig the pond on account of bad weather, the Defendant's husband stated that he had been paid a large portion of the contract price, and thus had the funds available to pay the Plaintiff Two Thousand One Hundred dollars ($2,100.00).
Also corresponding to the above account of events, the Defendant related to the Court that she did not have anything to do with her husband's contracting business. When asked why she issued a check from her personal checking account for her husband's contracting business, the Defendant explained that she and her husband kept separate accounts and that her husband, for this particular transaction, had asked her to issue a blank check. The Defendant, however, stated that she was not under the impression that it would be the Plaintiff who would fill in the amount on the check. Similarly, the Defendant related to the Court that she did not in any manner foresee that the blank check issued to the Plaintiff would be tendered for payment in the amount of Nine Thousand Six Hundred and 11/100 dollars ($9,600.11).
The Plaintiff, on the other hand, gave an entirely different account of events. Of particular importance in this regard is that, according to the Plaintiff, no notice was imparted to it that the Defendant's husband was finished using its rental equipment. In fact, according to Plaintiff, it picked up the equipment because it had not heard from the Defendant's husband despite its repeated attempts to contact him. Additionally, and contrary to the Defendant's husband's recollection of events, the Plaintiff maintains that for the rental of the digging equipment it had quoted a much larger figure than Two Thousand One Hundred dollars ($2,100.00).

LEGAL ANALYSIS
The Plaintiff in this case seeks a determination that the claim it holds against the Defendant is a nondischargeable obligation pursuant to § 523(a)(2)(A) of the Bankruptcy Code. As such a determination concerns the dischargeability of a particular debt, this matter is a core proceeding over which this Court has been conferred with the jurisdictional authority to enter final orders. 28 U.S.C. § 157(b)(2)(I).
A creditor seeking to except a debt from discharge under § 523(a)(2)(A) must establish the existence of each of the following elements by a preponderance of the evidence:
(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2) the debtor intended to deceive the creditor;
(3) the creditor justifiably relied on the false representation; and
(4) the creditor's reliance was the proximate cause of its loss.
*729 Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir.1998). In making a determination as to whether these elements have been satisfied, it is well-established that, as with other exception to nondischargeability, such exceptions to discharge are to be construed strictly against the creditor. Id. at 281. Thus, if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor. ITT Fin. Servs. v. Szczepanski (In re Szczepanski), 139 B.R. 842, 844 (Bankr.N.D.Ohio 1991).
As is common in most cases brought pursuant to § 523(a)(2)(A), the primary issue raised in this case is whether the Defendant acted with the requisite intent to deceive the Plaintiff. In In re Rembert, the Sixth Circuit Court of Appeals addressed this issue and held that "[w]hether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard." Id. at 281, citing Field v. Mans, 516 U.S. 59, 70-72, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). Going further, the Sixth Circuit went on to state that a court, in ascertaining a debtor's subjective intent, is to look at the totality of the circumstances. Id. at 282. In particular, the Sixth Circuit held that what a court needs to do is examine all of the evidence and thereafter make a determination as to whether such "evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." Id. citing Chase Manhattan Bank v. Murphy (In re Murphy), 190 B.R. 327, 334 (Bankr.N.D.Ill.1995).
In looking at all of the circumstances of this case, one of the most prominent features is the lack of any sort of direct representation made by the Defendant to the Plaintiff; that is, the Defendant merely signed a blank check which was later transferred to the Plaintiff. In this respect, the Court is not aware of any legal principle which, in the absence of other facts corroborating facts, would cause the drawer of blank check to become liable in fraud for an unlimited amount. For example, it has been held by the Supreme Court of the United States that "a check is not a factual assertion at all" and thus does not "make any representation as to the state of [the drawer's] bank balance." Williams v. United States, 458 U.S. 279, 284-85, 102 S.Ct. 3088, 3091-92, 73 L.Ed.2d 767 (1982). Similarly, the Sixth Circuit Court of Appeals has held that a check does not make any representation, and thus it cannot make any misrepresentation. Stewart v. East Tenn. Title Ins. Agency, Inc. (In re Union Sec. Mortgage Co.), 25 F.3d 338, 341 (6th Cir.1994).
Nevertheless, a direct representation, although it should be accorded a significant amount of evidentiary weight, is not the sine qua non of a cause of action under § 523(a)(2)(A). See, e.g., AT&T Universal Card Services v. Mercer (In re Mercer), 246 F.3d 391, 404 (5th Cir.2001) (en banc) ("When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required."). In this respect, the Plaintiff, at the Trial held on this matter, attempted to show that both the Defendant and her husband together engaged in a common scheme to defraud/misrepresent it. In doing so, the Plaintiff called the Court's attention to these two particular facts: (1) the checking account maintained by the Defendant never had sufficient funds in it to cover the amount of the Plaintiff's invoice; and (2) at the time the Defendant wrote the check in question, the Defendant's account was frequently overdrawn. However, after considering this matter, it is evident to the Court that a *730 couple of significant weaknesses  both factual and legal  exist with the position posited by the Plaintiff.
First, factually speaking, there does not exist sufficient evidence in this case to find that the Defendant played any more than a passive role in her husband's construction business. As such, there is nothing to suggest that the Defendant was aware, at the time she signed the blank check, that she would become liable for a debt of just under Ten Thousand dollars ($10,000.00). Consequently, this Court simply cannot find anything nefarious about the Defendant failing to maintain sufficient funds in her checking account to cover the Plaintiff's invoice.
However, even if this were not the case, the Court is not convinced that the Defendant's husband actually sought to misrepresent/defraud the Plaintiff. For example, the Defendant's husband, after he completed his digging work, made payments on his obligation to the Plaintiff totaling Seven Hundred dollars ($700.00). In this respect, it is well-established that partial payments on a debt mitigate heavily against a finding of fraudulent intent. See, e.g., Oetker v. Bullington (In re Bullington), 167 B.R. 157, 161 (Bankr.W.D.Mo.1994). Also going against the existence of any fraudulent intent is the fact (which was not contested) that the Defendant's husband was charged by the Plaintiff significantly more for the rental of the digging equipment than what he was receiving for digging the pond, thereby lending credence to the assertion by the Defendant's husband that he did not expect to be charged approximately Ten Thousand dollars ($10,000.00) for the rental of the equipment. Finally, it should be noted that, contrary to a common badge of fraudulent intent, both the Defendant and her husband did not immediately seek to file for bankruptcy relief after incurring their debt to the Plaintiff. See Household Credit Serv. v. Ettell (In re Ettell), 188 F.3d 1141, 1145 (9th Cir.1999); National Bank of Commerce v. Lazar, 192 B.R. 161, 164 (W.D.Tenn.1995). Accordingly, given these conclusions, the Court cannot find that any sort of scheme existed between the Defendant and her husband to defraud the Plaintiff.
Also, in addition to the above factual issues, the Plaintiff has, in essence, argued that the Defendant should be found liable for fraud, as a matter of law, on the basis that, while experiencing financial difficulties and with limited funds in her checking account, she issued a check which was later returned NSF. As the following explains, however, there exist a couple of inherent weakness with this legal argument. First, the Sixth Circuit Court of Appeals, in In re Rembert, made it very clear that the mere fact that a debtor may be experiencing financial difficulties at the time of the alleged fraudulent transaction is not enough to find that the debt was, in fact, incurred fraudulently. Id. at 281. Second, it has also been held that the mere issuance of a "bad check," standing alone, is not a sufficient ground for a determination that a debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). In re Strecker, 251 B.R. 878, 882 (Bankr.D.Colo.2000); Tusco Grocers, Inc. v. Coatney (In re Coatney), 185 B.R. 546, 548-50 (Bankr.N.D.Ohio 1995). As was explained in New Austin Roosevelt Currency Exchange, Inc. v. Sanchez (In re Sanchez):
Generally, the utterance of a bad check, without more, is insufficient to show a false misrepresentation. This is because a check is not a "statement"; rather, it is an order to a drawee bank to pay the face amount upon presentment, supported by a promise to remunerate the bank in the future or to make good on the check if it is dishonored. However, *731 circumstantial evidence can be introduced to show that the issuance of a bad check was intended to defraud a creditor.
277 B.R. 904, 909 (Bankr.N.D.Ill.2002), citing Williams v. United States, 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767.
Therefore, for these reasons, it is the holding of this Court that a debtor who, while experiencing financial difficulties writes a check which later turns out not to have sufficient funds in the account to cover the indebtedness, will not necessarily be deemed to have committed an act proscribed by § 523(a)(2)(A) unless additional corroborating evidence is offered in support. Accordingly, in this case, since there exists (as was explained earlier) insufficient corroborating evidence to find that the Defendant, or for that matter her husband, acted with the requisite intent to defraud/misrepresent the Plaintiff, the Court cannot find the exception to discharge set forth in § 523(a)(2)(A) is applicable. Accordingly, any legal obligation that the Defendant had to the Plaintiff as a result of the blank check she issued to the Plaintiff will be a dischargeable debt in bankruptcy. Before concluding, however, one final issue needs to be addressed.
The Defendant, in her answer to the Plaintiff's complaint, asserted a counterclaim against the Plaintiff. The basis for this counterclaim was that the Plaintiff had misrepresented the amount that would be charged for the goods and services supplied by the Plaintiff. However, absolutely no substantiating evidence was presented supporting this contention. As such, the Court will dismiss the Defendant's counterclaim.
In reaching all of the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.
Accordingly, it is
ORDERED that any monetary obligation of the Defendant, Melissa Grilliot, to the Plaintiff, Busch, Inc., stemming from the Defendant's issuance of a check with insufficient funds, be, and is hereby, determined to be a DISCHARGEABLE DEBT.
It is FURTHER ORDERED that the counterclaim of the Defendant, Melissa Grilliot, be, and is hereby, DISMISSED.