STATE of Missouri, Respondent,

v.

Nicholas Roger HOLBRUCK, Appellant.

No. WD 75037.

Missouri Court of Appeals, Western District.

Aug. 6, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 2013.

Mary H. Moore, for Respondent.

Craig A. Johnston, for Appellant.

Before Division One: JAMES E. WELSH, Chief Judge, VICTOR C. HOWARD, Judge and MARK D. PFEIFFER, Judge.

VICTOR C. HOWARD, Judge.

Nicholas Holbruck appeals his conviction for stealing by deceit, section 570.030.1 RSMo Cum.Supp.2010. On appeal, Holbruck contends that there was insufficient evidence to support a finding that he was guilty of stealing by deceit. The trial court's judgment is affirmed.

**Factual and Procedural Background**

The State charged Nicholas Holbruck with the class C felony of stealing by deceit in violation of section 570.030.1.[1] A jury found Holbruck guilty of the charge, and the trial court sentenced him to five years of imprisonment.

Holbruck requested to meet with Officer Michael Montgomery on December 10, 2010, and reported that some of his checks had been forged between November 11 and 13. He told the officer that checks had been forged at Wal–Mart, Break Time, and Casey's, that he had reported to his bank in November that some of his checks had been stolen, and called the bank again on November 15 to stop payment on that entire book of checks. Holbruck further told the officer that he received letters from TSR Services stating that the checks were written and the bank did not cover them.

Holbruck told Officer Montgomery that a former friend, David Argosy, had stolen his checkbooks and written the checks, and that Mr. Argosy disguised himself to look like Holbruck. Holbruck said he had received an email from Mr. Argosy in 2006 saying he had taken Holbruck's checks and was going to forge his name on the checks. Holbruck provided Officer Montgomery with the letters from TRS Services, the check numbers, the dates the checks were written, and where the checks were written.

Officer Montgomery investigated Holbruck's story, first contacting Leah Homfeld, the asset protection coordinator at the Wal–Mart in Marshall, one of the places Holbruck's checks had been used. Ms. Homfeld retrieved the store video that showed Holbruck write a check, leave the store, and get into a Roar taxi. Officer Montgomery then went to Break Time and spoke with the manager, who was able to provide video of Holbruck writing a check there. Officer Montgomery then attempted to locate Mr. Argosy, but was unsuccessful. He provided his initial report to Detective Lieutenant Pitts.

Betty Cole, a driver for Roar Taxi Service, received a call from Holbruck on November 11, 2010, who wanted a ride from his home to Wal–Mart in Marshall. Ms. Cole recognized Holbruck's voice on the call because he was a repeat customer and had formerly been her neighbor. Ms. Cole then picked up Holbruck and took him to Wal–Mart and then back home.

1. All statutory references are to RSMo Cum. Supp.2010 unless otherwise noted.

Later that day, between 2:30 and 3:30 p.m., Holbruck called Roar Taxi Service again and requested a ride to Sedalia, and Ms. Cole drove him from his house in Marshall to Enterprise Car Leasing in Sedalia. Holbruck told Ms. Cole that he was renting a car to go visit family. Ms. Cole identified Holbruck in court.

Ms. Homfeld testified that it is Wal-Mart's policy to accept only checks that are "valid and binding on the customer." Lisa Riley, from Casey's General Store, where another of Holbruck's checks was written, testified that she normally takes the checks to the bank the day after they are given to the store. Ms. Riley said that Casey's expects that the payment is valid and would not accept the checks if they could not be cashed. Ms. Riley identified Holbruck in court as a person who had purchased lottery tickets from Casey's before. Debbie Rogers, manager at Break Time, testified that Break Time expects that checks are valid and will be paid, and assumes that a customer will not stop payment on his or her checks. Ms. Rogers recognized Holbruck because he was a frequent customer and identified him in court. Robert Short, another Break Time employee, also recognized Holbruck as a frequent customer and identified him in court.

Holbruck testified in his own defense. He admitted that he wrote and cashed the checks on November 11, 12, and 13, 2010, and that he stopped payment on the checks on November 15. Holbruck then testified that as he was leaving his apartment on November 9 or 10, he saw a box on the floor, which contained a walkie-talkie, instructions on its operation, and a note indicating that it was urgent that he call immediately. He used the walkie-talkie to call and was told his sister had been kidnapped and that he would have to do as instructed or the kidnapper would kill him

and "have a little fun with [his] sister before they killed her too." He was told not to contact police or his sister would suffer. He was forced to wear a listening device to ensure that he did not contact the police.

Holbruck further testified that the kidnapper wanted $5,000 for the safe return of his sister, and that because he was disabled, he was unable to pay the $5,000. The kidnapper provided him with another option: he was given a list of things to buy for the kidnapper and instructed to rent a car so that he could get to the stores to buy the items. After he rented the car, he was told to go to the Sedalia Wal-Mart, but he did not remember what he bought, and he also purchased items that he was instructed to buy at Casey's, Break Time, and Wal-Mart in Marshall. He left the purchased items at a designated location for the kidnappers to retrieve along with the walkie-talkie and the listening device. After Holbruck delivered the items, he received a phone call telling him that his sister was fine. Mr. Holbruck testified that when he wrote the checks and stopped payment on them, he was not trying to defraud the businesses.

Holbruck was found guilty of stealing by deceit and was sentenced to five years in prison. This appeal by Holbruck followed.

## Sufficiency of the Evidence

In his sole point on appeal, Holbruck contends that there was insufficient evidence to support his conviction. He claims that the evidence was insufficient to establish beyond a reasonable doubt that he committed the crime of stealing by deceit because it did not show that he purposely made false representations to businesses upon which they relied when he paid for items using checks, and he later stopped payment on them before they could be paid. He asserts that the passing of a

check, which is later not paid, does not equate with making a false representation because a check is not a factual assertion, and the checks do not make any representation as to the state of his bank balance or his subsequent actions concerning those checks. He further contends that there was no showing that the businesses relied upon any false representation that he allegedly made.

When a defendant challenges the sufficiency of the evidence to support a conviction, appellate review is limited to " 'a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.' " *State v. Karl*, 270 S.W.3d 514, 515 (Mo.App. W.D.2008) (quoting *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998)). We accept as true all evidence favorable to the State, including all favorable inferences drawn therefrom, and disregard all evidence and inferences to the contrary. *Id.* "A jury may believe all, some or none of a witness' [s] testimony, and the jury must resolve any contradictions or conflicts in that testimony." *State v. McMellen*, 872 S.W.2d 508, 510 (Mo.App. W.D.1994).

Holbruck was charged with stealing by deceit in violation of section 570.030, which provides that "[a] person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." § 570.030.1. Section 570.010(7) defines "deceit" as "purposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind." However, "[d]eception as to the actor's intention to perform a promise shall not be inferred from the fact alone

that he did not subsequently perform the promise." § 570.010(7). The State must establish that the defendant had the intent to cheat or defraud at the time the false representation was made to cause the victim to part with his or her property. *State v. Morris*, 699 S.W.2d 33, 36–37 (Mo.App. W.D.1985). Because the subjective intent of a defendant can rarely be established by direct evidence, intent may be proven by circumstantial evidence. *McMellen*, 872 S.W.2d at 510. As noted in the statutory definition of "deceit," such circumstantial evidence must include more than the fact that the promise was not performed. *Id.* As applied to this case, deceit cannot be inferred from the fact alone that a check was passed that was not later paid.

Holbruck argues that writing checks to a business does not constitute a representation because it is not a factual assertion as to the state of the maker's bank balance nor his subsequent actions concerning the checks. The State argues that circumstantial evidence showed that Holbruck's subjective intent at the time he wrote the checks to the businesses was to obtain property from the businesses through deceit.

Holbruck relies on *Williams v. U.S.* as support for his argument that passing bad checks or checks the maker does not intend to pay later does not constitute a representation, much less a false one. 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). In *Williams*, the defendant was charged pursuant to a statute that made it a crime to

knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action of [certain enumerated financial institutions, among them banks whose deposits are insured by the Federal Deposit Insurance Corporation], upon any application,

advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan.....

458 U.S. at 282, 102 S.Ct. 3088. The petitioner's charged conduct consisted of "a series of transactions that seemingly amounted to a case of 'check kiting.' " [2] *Id.* at 281, 102 S.Ct. 3088.

In *Williams,* the U.S. Supreme Court reasoned that the petitioner's conduct

did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. *Each check did not, in terms, make any representation as to the state of petitioner's bank balance.*

*Id.* at 284–85, 102 S.Ct. 3088 (emphasis added).

The State argues that Holbruck's reliance on *Williams* is misplaced because that case was interpreting a different statute and that Holbruck's conduct was sufficient to constitute stealing by deceit under the applicable Missouri statute when he presented checks to the three stores in exchange for merchandise knowing the checks would not be honored. In arguing that Holbruck's conduct constituted stealing by deceit as supported by circumstantial evidence of his intent, the State primarily relies on the Missouri case of *State v. Thompson,* 314 S.W.3d 407 (Mo.App. W.D.2010). *Thompson* involved a conviction under section 570.030.1 for stealing by deceit, perpetrated by a defendant who made a bid for a job of customizing and installing granite countertops and took money from the victims to buy material but did not buy the material or perform the job. 314 S.W.3d at 411.

In *Thompson,* the defendant received the victims' check and signed a document showing that the granite had been paid for, but he did not purchase the granite that day. 314 S.W.3d at 411. On several occasions when one of the victims contacted the defendant, he said that he would do the job but never arrived to do the work. *Id.* at 411–12. The defendant never initiated contact with the victims, would not return phone calls made on their behalf, and eventually, the phone number they had been calling to reach the defendant went out of service. *Id.* at 412. During this time period, the victims were not aware that the defendant had permanently

---

**2.** "Check kiting" is explained in the opinion as follows:

The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection. By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks[.]

*Williams,* 458 U.S. at 281, 102 S.Ct. 3088.

moved to Florida. *Id.* After the police contacted him, the defendant called the victims and offered to refund the money, but never paid the money back to the victims. *Id.*

This Court held that there was sufficient evidence to uphold Thompson's conviction because the *totality of the circumstances*, not just the defendant's failure to perform the promised service, provided sufficient evidence from which the jury could have inferred that the defendant intended to appropriate the victims' money with the purpose to deprive them thereof by means of deceit. *Thompson*, 314 S.W.3d at 412.

In the instant case, the evidence reveals that Holbruck's conduct included writing checks totaling $645.07 and at the time his bank balance was between $171.13 and $9.64. Holbruck further made cash withdrawals and had checks that did clear the bank during the same timeframe that totaled $161.49. Holbruck had a previous conviction for passing bad checks. Holbruck stopped payment on the checks written during the relevant timeframe and first invented a story about his checks being stolen and forged by David Argosy, and later created another story that his sister was kidnapped and the kidnapper made him write the checks to get merchandise he then gave the kidnapper in return for his sister's safe release.

Certainly it could be inferred from the circumstantial evidence discussed above that Holbruck had intent to deprive the businesses to whom he passed checks of their property. We recognize the holding in *Williams*, that merely writing a check is not a representation under the specific federal statute being interpreted in that case, but we decline to apply that conclusion here and apply instead the totality of the circumstances analysis from *Thompson*.[3]

■ Holbruck's charged conduct involved writing checks on a bank account that could not cover their face amounts, giving them to businesses in exchange for property, and a few days later stopping payment on the checks that were outstanding based on one farfetched story that he later changed in his testimony at trial to another story just as implausible as the first. Like in *Thompson*, here, sufficient evidence was presented to uphold Holbruck's conviction because the totality of the circumstances surrounding Holbruck's conduct provided sufficient evidence from which the jury could have inferred that Holbruck intended to appropriate the victims' property with the purpose to deprive them thereof by means of deceit.

Because we find that there was sufficient evidence from which a reasonable

---

3. We note that at least one state court decision has rejected an argument similar to Holbruck's, on the basis that *Williams v. U.S.* adopted its construction of the federal statute based on its conclusion that "the legislative history of the statute did not support a finding that 'check kiting' constituted a 'false representation' under the statute." *State v. Williams*, 134 Ariz. 411, 656 P.2d 1272, 1277 n. 5 (App.1982). We also note that *Williams v. U.S.* apparently read the federal statute as requiring a false statement of a presently-existing fact, which in that case the Court interpreted to mean a false statement "as to the state of petitioner's bank balance." 458 U.S. at 285, 102 S.Ct. 3088. Here, by contrast, section 570.010(7) provides that "deceit" can include misrepresentations not only "as to a matter of fact," but as to matters of "law, value, intention or other state of mind." As the United States Supreme Court recognized in *Williams v. U.S.*, the drawer of checks "commit[s] . . . to make good the obligations if the banks dishonored the drafts." 458 U.S. at 284, 102 S.Ct. 3088. In this case, the jury could have found that Holbruck falsely represented that he had the intention of satisfying any obligations represented by the checks, bringing him within section 570.030, even if his conduct would not have constituted a false statement under the federal statute at issue in *Williams v. U.S.*

juror might have found Holbruck guilty beyond a reasonable doubt of stealing by deceit, the trial court did not err in entering judgment and sentence for violating section 570.030. Holbruck's point on appeal is denied. The judgment of the trial court is affirmed.

All concur.