**STATE of Missouri, Respondent,**

v.

**Joshua C. CHRISTOPHER, Appellant.**

### WD 79201

Missouri Court of Appeals,
Western District.

OPINION FILED: April 25, 2017

Gregory L. Barnes, Jefferson City, MO, for respondent.

Jedd C. Schneider, Columbia, MO, for appellant.

Before Division Four: Mark D. Pfeiffer, Chief Judge, Presiding, Lisa White Hardwick, Judge and Gary D. Witt, Judge

Gary D. Witt, Judge

Joshua Christopher ("Christopher") appeals his conviction of the offense of financial exploitation of the elderly pursuant to section 570.145.[1] Christopher argues that the trial court erred in dismissing his motion for acquittal because there was insufficient evidence by which a jury could convict him. Christopher also argues that the trial court abused its discretion in overruling his objection to the admission of evidence regarding money cards and copies of some of the victim Ed Burnham's ("Burnham") financial records. We affirm.

## Facts and Procedural History

Christopher met Burnham in 2011, when Burnham was 92 years old and Christopher was approximately 24 or 25 years

---

1. All statutory references are to RSMo 2000 as supplemented through the time of Christo-pher's alleged conduct, unless otherwise noted.

old.[2] The two became friends while Christopher was doing work in Burnham's neighborhood. In the beginning, Christopher helped Burnham around his home with odd jobs, such as replacing light bulbs, installing a garbage disposal, and removing a tree from his backyard. Burnham paid Christopher for his work.

Christopher was unemployed during most of the relevant period and had a difficult time finding employment. Christopher also had a gambling addiction, which Burnham knew about. Christopher and Burnham would meet at Burnham's home three or four times a week, and Christopher would call Burnham often when he was in need of money. As time went on, the amount of money Christopher requested and the frequency of his requests for money both increased.

Burnham testified that he and Christopher had a misunderstanding regarding whether the money given to Christopher by Burnham were loans or gifts. Many, but not all, of the checks that Burnham wrote to Christopher were denominated thereon as "loan" or "loan Joshua [Christopher]." Burnham expected Christopher to pay back the loans. Christopher did make some payments to Burnham at various times but would shortly thereafter request more money from Burnham. Over the course of their dealings, Christopher did pay back approximately $24,269.79 of the over $300,000 that he received. During many conversations, Christopher would tell Burnham that he was trying to get a job to "pay back the money" or "repay the money that he owed." Christopher told Burnham that he was going to receive money from helping a friend run a restaurant or he was about to inherit money from his grandmother in Italy.

In the beginning, Burnham got cash from Commerce Bank and Bank of America to loan to Christopher. Burnham also had two brokerage accounts on which he had check writing privileges, one of which was with Morgan Stanley. On one occasion, Burnham attempted to get money for Christopher from his Commerce Bank account, but Commerce Bank suspected something inappropriate was going on because of the quantity of withdrawals he had made and the number of checks written to Christopher. Christopher told Burnham he was being held in police custody in the Topeka area, which Burnham conveyed to Commerce Bank. Commerce Bank called to verify Christopher's story and found out that he was not in custody where he claimed. Commerce Bank then informed Burnham they could not continue his account due to the trouble concerning Burnham's money transfers. Burnham moved his account to Wells Fargo. Commerce Bank also alerted the Department of Health and Senior Services to what had happened and that they suspected Burnham was being taken advantage of. The Department of Health and Senior Services contacted both Burnham and Christopher and urged Burnham to stop helping Christopher.

On at least two occasions, Christopher told Burnham that he had "lost" a check that Burnham had given him, and Burnham gave him a "replacement" check, only to find that Christopher had cashed both the original and replacement checks. One of these checks was for the sum of $4,700 and the other was for $8,000.

Christopher also taught Burnham how to get money to him through the use of money cards. The money cards allowed

---

**2.** Burnham was very sharp for his age and in good health. He took up running when he retired at the age of 70. From the time he was 70 until he was 92, he ran 138 marathons and ran five-kilometer races almost every weekend at the time he met Christopher.

Burnham to purchase cards in $500 increments and he then would call Christopher with the number on the card, allowing Christopher to redeem the money wherever he was. Because there was a limit on how many money cards could be purchased at Wal–Mart on a particular day, Burnham also bought money cards from CVS pharmacy.

As time went on, Burnham wrote checks to Christopher out of his Morgan Stanley brokerage account. On occasion there was not enough cash in the account, forcing stocks to be sold to cover those checks. Burnham had to take a personal loan from Wells Fargo, secured by his investments, to cover all the checks that he was writing. Burnham's nephew, Herbert Burnham ("Herbert"),[3] was notified by Morgan Stanley when Burnham's account managers became concerned with his unusual increase in activity. Herbert stepped in to take over Burnham's financial affairs in June 2013. Burnham's check writing privileges with Morgan Stanley were subsequently terminated.

It is unclear how much exactly was owed to Burnham due to the seemingly arbitrary designation between what was and was not denominated as a loan. Over the course of two and one half years, Burnham claims Christopher was loaned $344,266.44. Herbert testified that, based on his review of the records, the total was "$325,000 and change," while Christopher claims Burnham was only owed $100,267.97. Christopher claimed most of the money transfers were gifts rather than loans.

After Herbert notified the authorities about these transactions, Christopher was interviewed by a detective with the sheriff's department. Christopher waived his

*Miranda*[4] rights orally and in writing. Christopher said that he had done some odd jobs for Burnham and that, while they did not have a specific agreement for payment, Burnham always paid him for the work. Christopher also stated that he would contact Burnham to borrow money or would just ask for money and that Burnham had loaned him some money over time. He stated he had promised on many occasions to repay the money to Burnham and that on many occasions Burnham had contacted him regarding when he would be able to pay back the borrowed money. Christopher indicated he had made some payments to Burnham and that he had tried to repay some of the money. When the detective asked him how he intended to repay Burnham, Christopher indicated he had other rich friends or wealthy individuals from whom he could obtain the money if needed. Christopher stated that he was a gambling addict, he was having trouble controlling his addiction, and that at times he had lied to Burnham about why he needed money. Christopher estimated that he had received "somewhere close to a half a million dollars" from Burnham but that he should only have to repay "somewhere just shy of $200,000" because the remainder constituted gifts and not loans. He indicated that he believed his debt from the loans was approximately $180,000.

On December 12, 2013, charges were filed against Christopher in the Cass County Circuit Court. The case proceeded to jury trial in September of 2015 on one count of the Class A felony of Financial Exploitation of the Elderly with a value in excess of $50,000, in violation of section 570.145.

**3.** To avoid confusion, Mr. Herbert Burnham is referred to by his first name. No familiarity or disrespect is intended.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

During the trial, the State sought to introduce into evidence photocopies of checks from Burnham's Morgan Stanley account. While Burnham testified that it was his handwriting on the checks, there were little black areas underneath each check where Burnham said the amount of each check had been listed by the bank. Burnham believed that the originals had been highlighted by Herbert and the black areas were caused from the copying of the highlighted portions. However, Burnham was not with Herbert during the highlighting. Christopher objected, claiming that the exhibit was not a fair and accurate reproduction of the documents at the time they were created. The trial court overruled the objection and admitted the evidence.

Additionally, after Burnham testified regarding the use of money cards, defense counsel approached the bench and objected that the information regarding the money cards from Wal–Mart and CVS pharmacy was not disclosed to Christopher in discovery, creating "a *Brady*[5] violation." The trial court overruled the objection.

On September 3, 2015, the jury found Christopher guilty of the class A felony of financial exploitation of the elderly under section 570.145 with the value of the property of $50,000 or more. Christopher was sentenced to ten years of imprisonment and ordered to pay $100,000 in restitution upon release, pursuant to section 559.100.[6] This timely appeal followed.

## Analysis

Christopher asserts three points on appeal. In Point One, Christopher argues that the trial court erred in denying his motion for judgment of acquittal because the evidence at trial could not establish beyond a reasonable doubt that there was an agreement between him and Burnham, that he made a false promise to repay Burnham, that he did not intend to repay nor knew he would not repay Burnham, or that he intended to permanently deprive Burnham of his property, such that there was insufficient evidence by which a jury could convict him of financial exploitation of the elderly under section 570.145. Christopher argues in Point Two that the trial court abused its discretion in overruling Christopher's objection to admission of evidence concerning money cards because the information concerning this evidence was not provided by the State in initial discovery or any supplemental response. In Point Three, Christopher argues that the trial court abused its discretion in overruling Christopher's objection and admitting State's Exhibits Nos. 3, 5, 7, 9, and 10 because the testimony failed to establish the foundation necessary to admit the financial record copies.

## Point One

■ In Point One, Christopher argues that the trial court erred in denying his motion for judgment of acquittal because there was insufficient evidence by which a jury could convict him of financial exploitation of the elderly under section 570.145, in that the evidence adduced at trial could not establish beyond a reasonable doubt that there was an agreement between him and Burnham, that he made a false promise to repay Burnham, that he did not intend to repay nor knew he would not repay Burnham, or that he intended to permanently deprive Burnham of his property.

This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable

**5.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

**6.** The restitution order is not challenged in this appeal.

doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder "could have found the essential elements of the crime beyond a reasonable doubt." [*State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010)]. In reviewing the sufficiency of the evidence, all evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence. *Id.* All evidence and inferences to the contrary are disregarded. *Id.* "When reviewing the sufficiency of the evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). "[T]his court will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008) (internal quotation omitted).

*State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011).

Section 570.145.1 [7] provides:

A person commits the crime of financial exploitation of an elderly or disabled person if such person knowingly by deception, intimidation, undue influence, or force obtains control over the elderly or disabled person's property with the intent to permanently deprive the elderly or disabled person of the use, benefit or possession of his or her property thereby benefitting such person or detrimentally affecting the elderly or disabled person.

"Deception" is defined as follows:

A misrepresentation or concealment of material fact relating to the terms of a contract or agreement entered into with the elderly or disabled person or to the existing or preexisting condition of any of the property involved in such contract or agreement, or the use or employment of any misrepresentation, false promise in order to induce, encourage or solicit the elderly or disabled person to enter into a contract or agreement.

*State v. Livingston–Rivard*, 461 S.W.3d 463 (Mo. App. S.D. 2015) (quoting Section 570.145.2(1)).

Christopher makes several arguments against the existence of an agreement between him and Burnham. One such argument is that there was no agreement between him and Burnham because there was no consideration for Burnham giving Christopher money. There is only one reported Missouri case addressing the issue of what constitutes sufficient evidence to support a conviction under this statute. *See Livingston–Rivard*, 461 S.W.3d at 466–68. In that case, no issue was raised as to whether there was an agreement between the parties, but the court did take notice of the consideration given for the transfer of property. *Id.* at 468 ("...transferred two vehicles and their home to Defendant for a total of $100 consideration").

The fallacy in Christopher's argument is that there is no requirement in the statute that there be a valid contract between the victim and the defendant in order to fall under the provisions of the statute. The statute provides, as charged in this case, that a defendant, by the knowing use of deception, who obtains control over an elderly victim's property with the intent to permanently deprive them of that property for the benefit of the defendant and to the

---

**7.** Section 570.145 was amended by the Missouri Legislature effective January 1, 2017. For the purposes of this opinion, all additional references to this statute will be to the version in effect at the time of Christopher's criminal conduct between 2011 and 2013.

detriment of the victim has violated the statute. *See* section 570.145.1. The statute provides that deception is a misrepresentation or concealment of a material fact relating to the terms of "a contract *or* agreement." *See* Section 570.145.2(1) (emphasis added).

■■■ "In interpreting statutes, each word, clause, sentence and section of a statute should be given meaning." *Pitts v. Williams*, 315 S.W.3d 755, 762 (Mo. App. W.D. 2010) (internal quotations removed). "[T]he general rules of statutory construction require that meaning be given to each word used in a legislative enactment, insofar as possible and one word of a statute should not be considered a needless repetition of another." *State v. Harris*, 153 S.W.3d 4, 8 (Mo. App. W.D. 2005) (quoting *Lora v. Dir. of Revenue*, 618 S.W.2d 630, 633 (Mo. 1981)). It is clear by the legislature's use of both the terms "contract" and "agreement" that a valid contract is not required, but any "agreement" that falls within the terms of the statute is sufficient.

The other argument Christopher provides against the existence of an agreement between him and Burnham is that Christopher was unaware which amounts were to be considered a loan as opposed to a gift, and Christopher could not have known a repayment agreement existed or what its terms were to even induce Burnham into an agreement. However, Christopher's own statement to law enforcement establishes that he borrowed, and Burnham loaned him money with an agreement and expectation of its repayment. The evidence established that Christopher did in fact repay around $42,000 of the amounts he borrowed. While the exact amount of money loaned versus gifted is subject to some dispute, Christopher himself believed it to be approximately $180,000. This amount, even considering the amount repaid, is over double the $50,000 amount

required by the statute to make this a Class A felony. The evidence was sufficient for a reasonable juror to find that there was an "agreement" under the terms of the statute.

As to the element of "deception", Christopher himself admitted to police that he had lied about needing money for a car repair when he was really at a casino and he admitted that after he obtained the money he went back to gambling, using the money he obtained from Burnham. On another occasion, Christopher told Burnham that he was going to receive a substantial amount of money from his grandmother in Italy, but needed money to get to Italy to obtain the funds. Christopher acknowledged he did not even have a passport and created a preposterous story about being detained at the embassy in Italy but had received a check for the funds from his grandmother only to find out after returning to the United States that the check was invalid. Christopher also told Burnham that some checks were lost in order to obtain "replacement" checks, only to later cash both the original and replacement checks. Christopher readily acknowledged that he was using the money from Burnham to fund his gambling addiction, even though he had promised Burnham that he would quit gambling. This is clear evidence of "deception" as defined in the applicable statute.

■■■ Christopher further argues that there was no evidence that he had the intent not to repay the money or that he intended to permanently deprive Burnham of the money. Intent is rarely established by direct evidence and is usually inferred from circumstantial evidence and the reasonable inferences therefrom. *State v. Burns*, 444 S.W.3d 527, 529 (Mo. App. E.D. 2014). In this case, the circumstantial evidence of Christopher's intent not to repay and to permanently deprive Burnham of

the property is overwhelming. Christopher, by his own admission, "borrowed" almost $200,000, and the evidence would support a finding that the amount was almost double that figure, at a time when he was unemployed and had no discernable assets. Even though he did repay the total sum of $42,000 over the course of the parties' dealings, the evidence showed that when Christopher would make a payment he would immediately (sometimes on the same day) request and receive sums greater than the amount of his repayment. By his own statement to police, the only plan he had to repay, even the amounts he agreed he owed, was to obtain the funds from other rich friends and wealthy individuals, the equivalent of a Ponzi scheme to exploit the elderly.

■ The intent not to repay cannot be inferred solely from the fact that the funds were not repaid, but requires evidence that there was an intent not to repay the money at the time it was obtained. *State v. Holbruck*, 410 S.W.3d 239, 242 (Mo. App. W.D. 2013). The jury may consider the entire course of conduct and the totality of the circumstances in determining if the defendant had the requisite mental state. *Id.* at 244. We find that the extensive and overwhelming evidence here supports the jury's finding that Christopher never had any intent whatsoever to repay the funds that he obtained from Burnham.

Point One is denied.

### Point Two

■ In Point Two, Christopher argues that the trial court abused its discretion in overruling Christopher's objection to the admission of evidence concerning the money cards because the information

concerning this evidence was not provided by the State in initial discovery or any supplemental response in violation of Rule 25.03.[8] However, at trial Christopher objected to the admission of evidence regarding the money cards due to an alleged *Brady* violation, not a violation of Rule 25.03. "When the trial court rules properly on admissibility of evidence at the time, a claim of error on another ground advanced for the first time on appeal will not be considered." *State v. Winfield*, 5 S.W.3d 505, 515 (Mo. banc 1999). "The defendant is bound by the arguments made and the issues raised at trial and may not raise new and totally different arguments on appeal." *Id.*

Christopher's claim of a violation of Rule 25.03 was never raised or presented to the trial court and is raised for the first time here on appeal. Therefore, Christopher's claim of a violation of Rule 25.03 will not be considered. Further, the allegation of a *Brady* violation, which was raised at trial, is not contained in Christopher's Point Relied On or developed anywhere in his brief.

Point Two is denied.

### Point Three

■ Christopher argues in Point Three that the trial court abused its discretion in overruling Christopher's objection and admitting State's Exhibits Nos. 3, 5, 7, 9, and 10 because Burnham's testimony failed to establish the foundation necessary to admit the copies of the financial records.

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016). "A trial court's decision regarding the exclusion or admissibility of

---

**8.** All Rule references are to the current Missouri Supreme Court rules unless stated otherwise.

evidence is reviewed for an abuse of discretion." *Id.* "A trial court abuses its discretion only if its decision to admit or exclude evidence is 'clearly against the logic of the circumstance then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.' " *Id.* (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)).

*State v. Pennington*, 493 S.W.3d 926, 931 (Mo. App. W.D. 2016).

Christopher argues that the trial court abused its discretion by admitting Burnham's financial records despite little black spaces on the photocopies. Christopher argues that Burnham's testimony stating the spaces were likely caused by Herbert highlighting the document prior to copying was not sufficient foundation for the documents' authenticity.

When an additional mark on photocopied documents appears to merely be a result of the copying process, testimony may sufficiently explain the discrepancy. *State v. Kinder*, 942 S.W.2d 313, 328 (Mo. banc 1996) ("Furthermore, Dr. Allen's testimony under cross-examination by Kinder's counsel—that the additional mark appeared to be the result of the copying process—sufficiently explained the discrepancy."). Burnham testified that the checks were in his handwriting and the little black spaces were caused from the copying process. Additionally, the little black spaces did not obscure the amounts on the checks or the relevant details as to who they were issued to or the dates of the checks. We find no abuse of discretion by the trial court for admitting into evidence records that contain small and inconsequential marks caused from the copying process.

Point Three is denied.

### Conclusion

The judgment of the trial court is affirmed.

All concur