MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2020 ME 49
Docket:       Pen-19-185
Argued:       March 5, 2020
Decided:      April 16, 2020

Panel:        GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.*

STATE OF MAINE

v.

ROBERT K. LINDELL JR.

JABAR, J.

[¶1]  Robert K. Lindell Jr. appeals from a judgment of conviction of theft by unauthorized taking, theft by deception, securities violations, tax evasion, and failure to pay state income tax entered by the trial court (Penobscot County, *Anderson, J.*) following a jury trial.  Lindell contends that the court abused its discretion by admitting in evidence certain checks with their memo lines unredacted and a manual of employment procedures.  He also contends that the court erred by declining to instruct the jury on the definition of the word "conduct," by declining to instruct the jury on methods for calculating income taxes, and by failing to provide the jury with relevant statutes.  Finally, Lindell

---

* Although Chief Justice Saufley participated in the appeal, she resigned before this opinion was certified.

2

argues that the court erred by admitting evidence regarding conduct that occurred while Lindell was allegedly in California. We affirm the judgment.

## I. BACKGROUND

[¶2] Viewing the evidence in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt. *See State v. Nobles*, 2018 ME 26, ¶ 2, 179 A.3d 910. Lindell was licensed in Maine as a securities broker-dealer agent from approximately 1997 to 2017. As part of his business, he arranged for his clients to purchase investments through affiliated broker-dealers. Between 2010 and 2017, he conducted his business under the auspices of a Maine limited liability company (LLC), RK Lindell & Co., LLC, affiliating himself with Revere Securities, LLC.

[¶3] Lindell met his first victim (Victim 1) in 1997, while soliciting clients in the Belfast area. Victim 1 was a seventy-seven-year-old widow. The two developed a business relationship, and by the early 2000s Lindell was meeting weekly with Victim 1 at her home to discuss her finances. In 2004, Victim 1 executed a power of attorney (POA), appointing Lindell and a close family friend of the victim as agents. At the same time, Victim 1 established a trust (2004 Trust) to provide for her adult son.[1] The family friend was never made

---

[1] Victim 1's son is a disabled veteran, unable to live on his own or manage his own financial affairs.

aware of either the POA or the 2004 Trust. Victim 1 executed a will in 2005, appointing the family friend and Lindell as co-personal representatives. Neither the family friend nor Lindell was a devisee named in the will.

A.  Thefts During Victim 1's Lifetime

[¶4]  Beginning in 2010, Victim 1 wrote thirty-one checks, all payable to Lindell's company, for the purpose of purchasing various securities. These checks listed the name of the security in the memo line and the checks totaled approximately $595,000. Lindell deposited the checks into his business bank account, but did not use them to purchase the securities. In eleven instances, he used other funds from Victim 1's brokerage account, totaling $298,000, to buy the securities. In twenty of the thirty-one instances, Lindell did not buy the securities at all. In early 2012, Victim 1's health began to decline, such that she could no longer physically write checks. Lindell used the POA given to him by Victim 1 to write checks totaling $67,850 to himself or his business from Victim 1's personal checking account.

B.  Thefts from the Estate of Victim 1

[¶5]  Victim 1 died in June 2012. Her estate was valued at nearly $6.7 million, and the estate account was set up at a Maine bank. Her will set forth a testamentary plan by which one-third of her estate was to be placed in

a second trust for her son's benefit (Supplemental Trust). Among Victim 1's assets that passed outside of probate were an annuity (the Midland Annuity) and a life insurance policy (the Hartford Policy), together worth more than $1.1 million. These two policies each named the 2004 Trust as the beneficiary.

[¶6] In his capacity as personal representative of the estate, Lindell wrote checks totaling more than $500,000 to himself and to his business. He also transferred approximately $268,000 from the estate to the 2004 Trust.

C. Thefts from the 2004 Trust

[¶7] Shortly after Victim 1 died, Lindell opened three bank accounts in the name of the 2004 Trust, including two at branches located in Maine. Lindell transferred into these accounts approximately $275,000 from the Hartford Policy, approximately $823,000 from the Midland Annuity,[2] and approximately $167,000 from liquidated securities once held in the son's name. In total, Lindell directed more than $1.7 million to accounts held by the 2004 Trust, accounts over which he had sole control. Between 2012 and 2017, Lindell spent almost all of these funds. The bulk of the money, more than $900,000 total, was

---

[2] When Midland declined to forward the funds as Lindell requested, citing a conflict of interest on Lindell's part, Lindell prepared paperwork showing that he had stepped down as trustee of the 2004 Trust, installing the family friend in his stead. He directed the family friend to have Midland release the funds to him, which she did, believing that the money would go to the Supplemental Trust (she had no knowledge of the 2004 Trust). Lindell then deposited the money in a bank account opened in the name of the 2004 Trust.

used to purchase and renovate a home in California for his family.[3] The rest was largely used to pay Lindell's credit card bills and other personal expenses.

D.     Thefts from Victim 2

[¶8]  Lindell also managed the finances for a second woman (Victim 2), who was a longtime family friend of Lindell.  Lindell managed several Maine bank accounts held in the name of a trust (GLQD Trust).  Victim 2, who lived in France, was the beneficiary of the trust, and had very limited control and oversight of the accounts.  Between 2010 and 2017, without Victim 2's knowledge or permission, Lindell used more than $300,000 from GLQD Trust bank accounts to pay personal expenses, to pay his company, and to fund Victim 1's 2004 Trust.[4]  In total, Lindell misappropriated more than $3.5 million from his two victims.

---

[3]  Lindell spent much of his time from 2014 on in California, living with his family at this home. Lindell used the property as collateral to obtain a loan of $450,000, much of which he also spent on credit card bills, or simply withdrew as cash.

[4]  Lindell did not report as income any of the funds from the Estate of Victim 1, the 2004 Trust, or the GLQD Trust that were expended for his personal benefit for tax years 2011-2015.  The State argued at trial that these funds should all have properly been characterized as gross income, upon which state income tax should have been paid.  The State offered testimony that, in each of those five tax years, Lindell had knowingly evaded paying more than $2,000 in Maine income tax, forming the basis for Counts 6-10 of the indictment.

6

E.     Procedure

[¶9]  Lindell was indicted by a grand jury on March 1, 2017, and charged with one count of theft by unauthorized taking (Class B), 17-A M.R.S. § 353 (2018), and one count of knowing or intentional securities violation (Class C), 32 M.R.S. § 16508 (2018).  Two superseding indictments were returned on July 26, 2017, and April 25, 2018, adding an additional count of theft by unauthorized taking (Class B), two counts of theft by deception (Class C), 17-A M.R.S. § 354 (2018), five counts of intentional evasion of income tax (Class C), 36 M.R.S. § 184-A (2018), and five counts of failure to pay Maine state income tax (Class D), 36 M.R.S. § 5332(1)(A) (2018).  Lindell pleaded not guilty to all counts.

[¶10]  On October 23, 2018, Lindell moved in limine for the court to exclude from evidence the memo lines on the checks that Victim 1 wrote to him, arguing that they were inadmissible hearsay.  He also argued that all evidence of his use and control of money located in Maine that occurred after he moved to California was outside the jurisdiction of the court, and thus inadmissible, either to prove a theft or for any other reason.  The court denied Lindell's motion as to the hearsay issue and held that Lindell's conduct while in California was admissible to show "intent, state of mind, scheme, and plan."  The

court deferred its ruling regarding whether Lindell's California conduct was admissible as substantive evidence of theft, but ultimately declined to give such a limiting instruction to the jury.

[¶11] Following a seven-day trial in October and November 2018, the jury found Lindell guilty on all counts. The court entered a judgment of conviction and sentenced Lindell to seventeen years' imprisonment with all but ten years suspended, and three years' probation.[5] Lindell timely appealed the judgment of conviction. *See* M.R. App. P. 2B(b)(1).

## II. DISCUSSION

[¶12] Lindell argues on appeal that the trial court erred or abused its discretion in several ways. First, he contends that the court abused its discretion by admitting in evidence a manual of employee procedures published by Revere and certain checks with their memo lines unredacted. Second, he argues that the trial court erred by declining to instruct the jury on the definition of the word "conduct," by declining to instruct the jury on methods for calculating income taxes, and by failing to provide the jury with

---

[5] The Sentencing Review Panel rejected Lindell's application for leave to appeal his sentence. *See* M.R. App. P. 20; *State v. Lindell*, No. SRP-19-307 (Me. Sent. Rev. Panel Sept. 5, 2019).

8

relevant statutes. Finally, he contends that the court erred by admitting evidence of his conduct that occurred while Lindell was allegedly in California.

A. Admission of Check Memos in Evidence

[¶13] Lindell contends that the trial court abused its discretion by admitting in evidence checks issued by Victim 1 to Lindell without redacting information contained on the memo lines of the checks. Lindell argues that the memo lines contained inadmissible hearsay. *See* M.R. Evid. 802. "We review a trial court's ruling to admit or exclude alleged hearsay evidence for an abuse of discretion," and "will find an abuse of discretion if a party can demonstrate that the trial court exceeded the bounds of the reasonable choices available to it." *State v. Fox*, 2017 ME 52, ¶ 29, 157 A.3d 778 (quotation marks omitted). "The trial court has broad discretion in determining the admissibility of evidence . . . ." *Id.* (quotation marks omitted).

[¶14] Contrary to Lindell's arguments, the words in the check memos had independent significance as terms of an agreement or contract between Victim 1 and Lindell to purchase securities and as evidence of Lindell's knowledge of those terms, and thus were offered for a purpose other than the truth of the matter asserted. *See* M.R. Evid. 801(c)(2). Lindell concedes that the checks themselves are not hearsay, as they are documents of independent legal

significance.[6] *See Williams v. United States*, 458 U.S. 279, 284 (1982) ("[T]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'"); M.R. Evid. 801. Lindell fails to explain how information contained in the memos is conceptually distinct from the other information contained in the check—amount to be drawn, payor, payee, financial institution—that he concedes has independent legal significance.

[¶15] When the court denied the motion, holding that the check memos were subject to different interpretations and thus proper considerations for the jury, Lindell did not request that the court deliver a limiting instruction to the jury, which might have restricted their consideration to purposes other than the truth of the matter asserted. *See, e.g., State v. Nason*, 383 A.2d 35, 37 (Me. 1978) (noting that trial courts may issue contemporaneous instructions to the jury limiting the purposes for which specific evidence may be considered). Given the paucity of case law on the subject, the varied purposes for which the evidence might have been considered, and the broad discretion of the trial court in evidentiary matters, *Fox*, 2017 ME 52, ¶ 29, 157 A.3d 778, the court did

---

[6] Even if the check memos were deemed hearsay, they could have been admitted as evidence of the checkwriter's intent or plan for the use of the funds transferred by means of the checks. *See* M.R. Evid. 803(3).

not abuse its discretion in admitting the checks in unredacted form without a limiting instruction.

B.     Employee Procedure Manuals

[¶16]   Lindell also argues that the trial court abused its discretion by admitting in evidence copies of procedural manuals produced by Revere for its contractors and signed by Lindell, which contained procedures that arguably prohibited the conduct that gave rise to Count 3 of the indictment, a knowing or intentional securities violation.  Lindell objected to their admission at trial, arguing that they were inadmissible propensity evidence and likely to mislead the jury, but the trial court overruled the objection and admitted the manuals, accompanied by a limiting instruction.[7]  Lindell did not object to the language of the instruction, and therefore we review the instruction for obvious error. *State v. Pratt*, 2015 ME 167, ¶ 18, 130 A.3d 381.  The court's instruction correctly stated the law and relevant procedural posture in a thorough and

---

[7] The trial court instructed the jury as follows regarding the purpose of admitting the manuals:

> Now, I want to make sure that you understand as jurors that it is not a criminal violation or against the law per se to violate some employment procedure. . . . And there's no charge in the indictment that says he violated this procedure; therefore, that's a crime.  That's not at play here.  However, I am admitting the exhibit for whatever consideration you want to give it in deciding the issues that you do have to decide, which are the charges in the indictment itself.  So I just want to make sure you understand . . . a violation of an employment procedure is not a crime.  It's not charged.  That's not why this is being admitted.  But it is generally for your consideration.

clear manner. The record does not reveal any error in the instruction, obvious or otherwise. *See id.* Nor does the record demonstrate that the court abused its discretion in admitting the manuals for limited purposes, given the court's broad discretion, *Fox*, 2017 ME 52, ¶ 29, 157 A.3d 778, and the obvious relevance of the evidence. *See* M.R. Evid. 401, 402.

C.    Jury Instructions

[¶17]  Lindell contends that the trial court erred by not instructing the jury on the definition of the word "conduct" and by declining to provide the jury with certain statutes related to the calculation of income tax. "We review jury instructions as a whole for prejudicial error, and to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Hofland*, 2012 ME 129, ¶ 18, 58 A.3d 1023 (quotation marks omitted). "When the claimed error is the omission of a particular instruction, we will vacate the judgment only if the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id*. (alteration omitted) (quotation marks omitted).  We have previously applied a five-part test to review denied requests for jury instructions:

> We will vacate a judgment based on a denied request for a jury instruction if the appellant demonstrates that the requested instruction (1) stated the law correctly; (2) was generated by the evidence; (3) was not misleading or confusing; and (4) was not

sufficiently covered in the instructions the court gave. In addition, the court's refusal to give the requested instruction must have been prejudicial to the requesting party.

*State v. Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278 (citation omitted).

1. Lindell's Definition of "Conduct"

[¶18] First, Lindell argues that the court erred by declining to instruct the jury on his proffered definition of the word "conduct," which, in turn, he argues was relevant for determining whether the court had proper jurisdiction.[8] With regard to the preamble to the court's count-by-count instructions, Lindell asked that the court instruct the jury that "conduct" means "voluntary bodily movement," analogous to "act," as defined in 17-A M.R.S. § 2(1) (2018). The court declined to so instruct the jury, concluding that the two words did not share a common definition. Instead, the court instructed as follows: "Concerning all of these offenses, a person may be convicted under the laws of this State for any crime committed by the person's own conduct when the State proves beyond a reasonable doubt that the conduct that is an element of the offense occurs within this State."

[¶19] Lindell has failed to demonstrate that his requested instruction was an accurate statement of the law, was not misleading, and was not covered

---

[8] *See infra* ¶¶ 23-25.

by the court's given instructions. *Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278. "Conduct" is not defined in the Maine criminal code, *see generally* 17-A M.R.S. § 2, and Lindell failed to cite any law or other type of authority in support of his position. Without any authority supporting his claim that "conduct" was a term of art, the jury was entitled to interpret the word within its common meaning. *State v. Hall*, 2019 ME 126, ¶ 28, 214 A.3d 19 ("[W]hen a term is not defined in a statute, a jury can generally determine the meaning of the term by common sense.") He has not shown that the narrow definition he proposed was an accurate statement of the law (prong one) or was not misleading (prong three). Further, his proposed definition could reasonably be encompassed in the jury's commonsense interpretation (prong four). *See, e.g.*, *id.*; *Conduct*, Black's Law Dictionary (11th ed. 2019). Thus, the court did not err by declining to instruct the jury as to Lindell's proposed definition of "conduct."

2.      Section 5111 and Tax Calculation

[¶20] Next, Lindell argues that the court erred by declining to (1) instruct the jury on how to calculate income tax or (2) provide statutes relevant to such calculations. Counts six through ten of the indictment allege that Lindell "did intentionally attempt to defeat or evade the Maine Income Tax law imposed by 36 M.R.S.A § 5111 . . . by underreporting his income and/or gross receipts,

thereby reducing his taxable income" and that the amount evaded was more than $2,000. Lindell contends that, without the tax tables contained in 36 M.R.S.A § 5111 (2018), the jury could not have determined beyond a reasonable doubt the amount of tax evaded in each tax year. The trial court declined to provide the jury with a copy of section 5111.

[¶21] Contrary to Lindell's contention, the trial court did not err by declining to provide the jury with the text of 36 M.R.S. § 5111. Although such an instruction accompanied by the statutory text would have reflected an accurate statement of the law and was properly generated by evidence presented at trial, Lindell fails to demonstrate that he was prejudiced by the court's decision or that the law was not sufficiently incorporated by the court's given instructions. *Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278.

[¶22] The court instructed the jury on the general framework of the Maine income tax and its method of calculation. The State presented evidence from a securities investigator and expert in state and federal taxation on the particulars of Lindell's finances, and the court admitted in evidence Lindell's tax returns and documentation of the money that allegedly went unreported. The State offered testimony that demonstrated that the calculation of income tax liability involves more than merely applying a tax rate to a gross income figure.

Providing the jury with the text of the statute would have been an incomplete statement of the law governing income taxation. *See State v. Martin*, 2007 ME 23, ¶ 6, 916 A.2d 961 ("A trial court has wide discretion in formulating its instructions to the jury so long as it accurately and coherently reflects the applicable law." (quotation marks omitted)). Thus, Lindell has failed to demonstrate that the court erred in declining to instruct the jury in the manner requested. *Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278; *see also State v. Knox*, 2003 ME 39, ¶ 9, 819 A.2d 1011 (holding that we "look at the charge *as a whole* in determining whether a particular instruction" was prejudicial error).

D.     Territorial Applicability

[¶23]   Lindell argues that the trial court did not have jurisdiction to consider conduct in which he allegedly engaged while in California and therefore erred by admitting evidence of that conduct related to the theft and tax evasion charges. He contends that, because conviction of a crime in a Maine state court requires that the conduct that is an element of the crime occur in Maine, and he did not engage in any "conduct" in Maine with regard to certain counts, he cannot be convicted on those particular counts as a matter of law. He raised this defense with regard to Counts 1 and 2 (theft by unauthorized taking), and Counts 8, 9, and 10 (intentional evasion of tax).

[¶24] Criminal convictions in Maine state courts are limited, in part, by a statutory territorial applicability provision, 17-A M.R.S. § 7 (2018). This provision states, "[A] person may be convicted under the laws of this State for any crime committed by the person's own conduct . . . only if . . . the conduct that is an element of the crime or the result that is such an element occurs within this State." 17-A M.R.S. §§ 7(1); *see State v. Collin*, 1997 ME 6, ¶ 9, 687 A.2d 962. Theft by unauthorized taking or transfer has three elements: the person (1) obtains or exercises unauthorized control; (2) over the property of another; (3) with intent to deprive the other person of the property. 17-A M.R.S. § 353(1)(A); *State v. Nelson*, 1998 ME 183, ¶ 5, 714 A.2d 832. Intentional evasion of tax is prohibited by 36 M.R.S. § 184-A, and occurs when "[a] person . . . intentionally attempts in any manner to evade or defeat any tax."

[¶25] Lindell is legally accountable for his conduct if "[e]ither the conduct that is an element of the crime or the result that is such an element occurs within this State or has a territorial relationship to this State." 17-A M.R.S. § 7(1)(A). With regard to the theft charges and the tax evasion charges, the evidence establishes that Lindell engaged in conduct that constituted an element of the crime, and that conduct occurred in Maine, or the result of the conduct that was an element of the crime occurred in Maine or had

a territorial relationship with Maine. Lindell misappropriated money from Maine bank accounts while acting as trustee of a trust established under Maine law and while acting as the co-personal representative of an estate submitted for probate under Maine law. Lindell transmitted falsified tax returns to the Maine Revenue Service, located in Maine, evading income tax that he was legally required to pay in the State of Maine. The trial court did not err in concluding that Lindell's conduct satisfied the territorial applicability requirement of Maine law.

## III. CONCLUSION

[¶26]    Because Lindell's arguments regarding the jurisdictional provisions of the Maine Criminal Code are unpersuasive, because the trial court did not commit prejudicial error with regard to any of the challenged jury instructions, and because it did not abuse its discretion in admitting the manuals or unredacted checks in evidence, we affirm the judgment.

The entry is:

Judgment affirmed.

Marina L. Sideris, Esq. (orally), Camden, for appellant Robert K. Lindell Jr.

Aaron M. Frey, Attorney General, and Gregg D. Bernstein, Asst. Atty. Gen. (orally), Office of the Maine Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2017-707
FOR CLERK REFERENCE ONLY